In re CORRUGATED PAPER
CORP., Debtor.

Matthew D. ROCKMAN,
Trustee, Plaintiff,

v.

EASTERN CONTAINER
CORP., Defendant.

Bankruptcy No. 92–40360–JFQ.
Adv. No. 93–4163.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 31, 1995.

Robert C. Reichert, Reid & Riege, Hartford, CT, for Eastern Container Corp.

David B. Madoff, Cohn & Kelakos, Boston, MA, for Matthew D. Rockman, Trustee.

*OPINION*

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This case requires the court to explore the nature, value and transferability of business goodwill, that most amorphous of intangible assets. The plaintiff, the trustee in bankruptcy, asserts that shortly before its bankruptcy the debtor transferred to Eastern Container Corp. (the "Defendant"), for no consideration, valuable goodwill in the form of customer business. In response, the De-

fendant says the nature of the debtor's business was such that it had no transferrable goodwill. Having heard the evidence, I rule in the Defendant's favor. Set forth here are my findings of fact and conclusions of law.

## I. FACTS

The basic facts are either stipulated or undisputed. It is their inferences and legal consequences that are hotly contested.

Corrugated Paper Corp. (the "Debtor") was a manufacturer of corrugated boxes for use in industry, having a plant and office in Westboro, Massachusetts. Beginning in the late 1980's, it began suffering substantial losses due to manufacturing inefficiencies and improper pricing of its products. Its president and sole stockholder, Charles M. Dowd, devoted most of his time to sales, leaving administration to a general manager. His son, Michael C. Dowd, was also active in sales. Michael Dowd later became the Debtor's general manager, but by this time it was too late to save the company.

Events in the Debtor's final days moved swiftly. On October 17, 1991, Interstate Paper Corporation, an unpaid supplier, obtained a $361,023.90 judgment against the Debtor. The Dowds realized the company had to be sold. They attempted to sell it in its entirety, approaching four parties: The Defendant, Rand–Whitney Container Corp., Romanow Corp. and Interstate Paper Corporation. None was interested in purchasing the whole business. Two, the Defendant and Romanow, expressed interest in purchasing machinery and equipment.

By December 1, 1991, the Debtor was insolvent within the meaning of fraudulent transfer law. Early that month, Interstate attempted to levy on its judgment by obtaining a lien on the Debtor's bank account at Shawmut Bank, N.A. (the "Bank"). The Bank was the Debtor's principal lender. It replied to the judgment levy by offsetting the entire balance of the Debtor's bank account against the loan debt. The Debtor struggled on for a few weeks, barely making its payroll. On December 23, 1991, the Debtor laid off its factory employees and ceased manufacturing operations. At the Debtor's request, beginning in late December the Defendant and

Romanow completed the Debtor's pending purchase orders. The existing purchase orders were cancelled and replaced by new purchase orders issued to either the Defendant or Romanow.

The Bank held a security interest in essentially all the Debtor's assets. It insisted on controlling the pending negotiations with the Defendant and Romanow on the sale of the Debtor's machinery and equipment. The Bank also began to foreclose on its security interest in accounts receivable. On January 6, 1992, it made demand for payment upon all the account receivable debtors.

Michael Dowd testified, and I so find, that the Debtor's 1991 sales of $6.7 million were made to customers generated by the following officers and employees in these approximate amounts:

| | |
|---|---|
| Welton | $ 1.5 million |
| Christo | 1.2 million |
| Charles Dowd | 1.3 million |
| Michael Dowd | 1.0 million |
| Begosian | .5 million |
| Rousseau | .5 million |
| St. Armand | .2 million |
| Houle (house account) | .5 million |
| Total | $ 6.7 million |

The Defendant was interested in employing the two Dowds and three of the Debtor's five salesmen—Messrs Welton, Christo and Rousseau. As indicated above, Welton and Christo were among the Debtor's top salesmen. The Defendant told all five it would not employ them unless they signed agreements not to compete for three years following termination of employment. Christo declined to sign such an agreement. The Debtor had no written employment or noncompetition agreements with any of its employees. Christo went with another box manufacturer. The other four became employees of the Defendant and signed noncompetition agreements. Those signed by Welton and Rousseau stated the obligation not to compete was not to be effective until January 1, 1993. They contain no compensation terms and permit the Defendant to terminate the employment at any time, with or without cause and with or without notice. The Dowds signed two-year employment agreements which granted Michael Dowd an annual sala-

ry of $75,000, and Charles Dowd an annual salary of $81,250. Each also received $12,-500 annual consideration for three years following termination of employment for the non-competition covenants. All four agreements became effective on January 13, 1992. All but Welton's bear that date. Welton's is dated December 26, 1991. The Defendant also hired eight of the Debtor's office staff of some fifteen employees.

The Debtor's office and plant was owned by a Dowd affiliate, Vicar Realty Corp. On January 13, 1992, the Debtor and Vicar cancelled their existing lease. On the same date, the Defendant entered into a two-year lease with Vicar for a market rental. The Defendant's new employees then began working at the Debtor's former premises. The Debtor's software, containing information concerning its customers and other matters, was downloaded into the Defendant's computers, which were installed on the premises. The listing of the Debtor's telephone number was changed to the Defendant's name, so that a customer (or any other party) attempting to reach the Debtor had its call answered in the Defendant's name. Despite the two-year term of its lease, the Defendant occupied the premises only for a few months.

The Debtor did not execute any document purporting to transfer its goodwill to the Defendant. Except to the extent implicit in the events described, the Debtor never sought to transfer goodwill, nor did the Defendant seek to acquire goodwill.

On or about January 28, 1992, pursuant to an order in state court, the Bank took possession of the Debtor's machinery, equipment and other physical assets. The Bank rejected the Defendant's offer to buy all the machinery and equipment for 90% of the Bank's orderly liquidation appraisal. On February 7, 1992, Interstate Paper Corporation filed an involuntary chapter 7 petition against the Debtor in this court, and on March 4, 1992 an order for relief under chapter 7 was entered. Matthew D. Rockman (the "Trustee") was appointed trustee in bankruptcy. The Bank soon obtained relief from the automatic stay in order to continue its foreclosure. It sold some items of equipment and inventory to

the Defendant at private sale and the rest at a public auction conducted on June 29, 1992. The total sales proceeds were sufficient to pay the Bank in full.

As mentioned, the Debtor's 1991 sales were about $6.7 million. The Defendant declined to sell to a few of the Debtor's customers, for credit or pricing reasons. It did, however, make many sales to the Debtor's former customers, in these amounts: 1992—$2.839 million; 1993—$1.99 million. Calculations for 1994 have been made only through May. These sales were $.951 million, which when annualized comes to $2.283 million.

Charles Dowd is still employed by the Defendant. Michael Dowd left the Defendant's employ on January 23, 1995. He is now defending an action the Defendant brought against him for breach of his covenant not to compete. Welton left the Defendant's employ in May of 1992, and Rousseau left shortly thereafter. Welton's and Rousseau's noncompetition obligations therefor never came into effect because their employment terminated prior to the January 1, 1993 effective date of the obligations.

Christo, the salesman who declined employment with the Defendant, initially retained about 50% (by dollar amount) of "his" customers upon joining a competing corrugated box manufacturer. The Defendant acquired the balance of Christo's customers. At the present time, over three and one-half years later, Christo sells to about 70% of those customers. There was no evidence on whether the Defendant continued to sell to any of the remaining 30%.

## II. THE TRUSTEE'S CLAIMS

The Trustee initially joined the two Dowds as co-defendants in this suit. The complaint contains six counts. Counts I and II, which are against the Defendant only, allege a fraudulent transfer of goodwill within the meaning of section 548 of the Bankruptcy Code and the Massachusetts version of the Uniform Fraudulent Conveyance Act, Chapter 109A of the Massachusetts General Laws. Count III, brought against only the Dowds, is for breach of the Dowds' fiduciary obligations to the Debtor. Counts IV, V and VI,

brought against all three defendants, are based, respectively, on appropriation of trade secrets, conversion, and unfair and deceptive business practices under Chapter 93A of Massachusetts General Laws.

The Trustee has since settled his claims against the Dowds in an agreement which I have approved. At the beginning of trial, the Trustee waived Count IV for appropriation of trade secrets. The Defendant has also withdrawn its counterclaims, reserving the right to file an administration expense claim based on the causes of action set forth in the counterclaims.

We are therefor left with counts against the Defendant only grounded on fraudulent transfer of goodwill, conversion of goodwill and unfair and deceptive business practices. These counts all raise questions concerning the presence, value and transferability of the Debtor's goodwill. I now turn to that central issue.

## III. *GOODWILL*

Perhaps the best-known definition of goodwill is that of Justice Story:

> Goodwill may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices. Story, PARTNERSHIPS § 99 (7th ed. 1881).

■ Goodwill, in other words, is the expectancy a business has of continued patronage from its customers. The source of that expectancy may be advantageous relationships the business has with parties such as employees, suppliers, or financiers. Commons, *Industrial Goodwill*, 18–26 (1919); *Grace Bros., Inc. v. Commissioner of Internal Revenue*, 173 F.2d 170 (8th Cir.1949). Or it may be the location of the business or its general reputation. 38 AM.JUR.2d., *Goodwill*, § 4 (1968).

Usually, the prime source of goodwill, particularly the goodwill of a small business, is the relationship it has with its customers. This, in turn, often flows from the relationship particular individuals working in the business have with particular customers. If these individuals are owners of the business, the sale and transfer of goodwill can be easily accomplished by means of the owners executing both sales documents and employment agreements combined with covenants not to compete.

The typical example of such a sale is the sale of a small insurance agency. The value of such an enterprise consists almost entirely of customer goodwill. The owner usually agrees to be employed by the buyer (or to be an independent consultant to the buyer) for a short period of time, and not to compete for several years thereafter. During the period of employment, the owner does his best to establish a good relationship between the buyer and the agency's customers. He is thereafter bound by his covenant not to compete. When the owner's age and health are such that he has the ability to compete, a large portion of the sales price can be justifiably allocated to the covenant. *See* James F. Queenan, Jr., *Taxation of Covenants not to Compete in the Sale of a Business*, 4 B.C.INDUS. & COM.L.REV. 267 (1963). If, as is usually the case, the insurance agency has been operated through a corporation and the sales transaction takes the form of an asset sale, allocation of the sales price results in part of the price being paid to the corporation for its name and few tangible assets, and part being paid to the former owner for his covenant not to compete and employment or consulting services.

■ In these situations, therefor, goodwill is transferred through two supplemental methods: (1) the buyer is furnished with the symbols that have evoked a favorable response from company's customers, such as its name or location, and (2) the seller is eliminated as an alternative attraction. *See* Malcom J. Watson, 35 T.C. 203 (1960); Queenan, *supra*, at 275–76; Note, *An Inquiry into the Nature of Goodwill*, 53 Co-

LUM.L.REV. 600 (1953). It is important to bear in mind, however, that the individual owner, not the selling corporation, is the party who receives much of the sales price as consideration for his employment and covenant not to compete. The definition of "transfer" as used in section 548 of the Bankruptcy Code is nevertheless sufficiently flexible to include the transfer of goodwill by such means. Under the Code, transfer "means every mode, direct or indirect ... of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54) (1988).

■ Turning to the facts of the present case, it is obvious the Debtor faced special obstacles in attempting to transfer its expectancy of future patronage from customers. Based on all the evidence, I find this expectancy was highly dependent upon the continued employment of the salesman who services a particular customer. This is typical in the corrugated box industry. Salesmen are usually hired because of the business they can bring to their employer. When they leave, all or most of the customers they serve go with them to their new employer. Service and pricing are important factors in retaining that business. But little or none of a customer's business can be transferred to another box manufacturer unless that manufacturer employs the same salesman. A customer list, moreover, is not confidential information.

The Trustee points out that the Debtor, not its salesmen, paid for all customer solicitation expenses, including entertainment, and that the Debtor, through its office and plant employees, satisfied the desires of customers on price, quality and service. That of course is true. But customers are neither purchased nor owned. Their continued patronage is an expectancy only.

The Trustee also observes that a customer's payments went to the Debtor while the Debtor was in business, not to its salesmen. But that is not the point. The question before me is the Debtor's ability to sell or transfer a customer's patronage without the buyer paying a particular salesman for his continued services and covenant not to compete. Without a customer's salesman going with the buyer, the Debtor could do little more than recommend to the customer that it do business with a particular manufacturer rather than the salesman's new company. The Dowds did so here. They recommended to many of the Debtor's customers that the customers do business with the Defendant. But the chances this recommendation alone would be efficacious, at least for any significant period of time, were quite slim.

In summary, a customer of the Debtor serviced by one of the Dowds, or by Welton or Rousseau, who thereafter purchased boxes from the Defendant, gave his patronage to the Defendant because of the continued presence of the particular salesman. The Defendant, not the Debtor, paid for those services and for the salesman's covenant not to compete. The salesman, not the Debtor, transferred the customer's patronage through their employment with the Defendant and their covenants not to compete. Thus the Trustee has no right to claim the value of the customer's business.

This is not to say there was no value in the Dowds recommendation that a customer do business with the Defendant, or in the Defendant's acquisition of the Debtor's software, office employees and telephone number. All of this aided the Defendant in competing for the business of any customer whose former salesman obtained employment elsewhere. Some salesmen undoubtedly had a relatively weak hold on customers. Even the best could not control all his customers. This is demonstrated by the Defendant's ability to acquire, initially, about 50% of the business of those customers who had been serviced by Christo even though Christo went with another box manufacturer. But Christo soon acquired an additional 20%.

The value of the Debtor's recommendation, the Debtor's software and the other items acquired was therefor both minimal and unpredictable. This is typical of the corrugated box industry. As a result, such items are not separately purchased and sold in the industry. They therefor have no market value. It follows that the Trustee can recover nothing under his theory that valuable property was transferred. If the case had been tried under a theory of unjust enrichment, which it

was not, there would perhaps be presented the interesting question of whether it was unjust for the Defendant to have been enriched by some minor amount in light of the fact the Debtor's employees also benefitted from the transaction. An unjust enrichment claim would, however, necessarily fail due to the absence of any evidence of separate value to the Defendant of these items.

This case is far different from *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729 (1982), relied upon by the Trustee. The employees going with the new employer in that case were mostly security guards, not salesmen. There was no evidence any officer or employee had a special relationship with customers. The customers were concerned only with uninterrupted guard service. Indeed, that guard service was the product. The defendant there employed no new employees whose services were devoted to selling a product. Nor did the defendant there receive a covenant not to compete from anyone.

## IV. *DAMAGES*

There are deficiencies in the Trustee's case even if I were to accept his theory that the bankruptcy estate is entitled to the value of the acquired customer business. The Trustee's evidence of that value is unconvincing.

■ I am not persuaded the business obtained by the Defendant should be valued in the fashion suggested by the Trustee's expert, a certified public accountant. The witness opined that the acquired business was worth $324,000. He arrived at this figure by discounting projected earnings from the "acquired" customers. He used the Defendant's actual sales to these customers for 1992, 1993 and 1994 (annualized), and projected the sales for 1995 and 1996 based on an average of the 1993 & 1994 sales. This seems to be a very short period of time for projected sales and earnings. Typically, projections are for a longer period. *See* Shannon P. Pratt, *Valuing a Business* 67–85 (2d ed. 1989) ("Pratt"). The period of time selected is especially acute in the corrugated box industry because of the likelihood of losing a customer's business if the salesman leaves. For example, when Michael Dowd left the Defendant's employ early this year, he took with him the business of Cabletron Systems, Inc., which was worth about $1 million in sales. Significantly, the Trustee's expert arrived at his opinion without taking into account Michael Dowd's departure. A law suit is not a perfect substitute for sales.

In discounting projected earnings, the Debtor's expert used a discount rate of 25%. The proper rate to use is the percentage return an investor would reasonably expect in making an investment of comparable risk. Pratt, *supra,* at 74. A 25% rate seems to be an unreasonably high expected return.

The parties have devoted much argument to the question of whether the Debtor was a going concern on January 13, 1992. In the *Robinson* case, the court concluded that valuable customer business had been transferred. It based this conclusion, at least in part, upon its determination that the debtor there was a going concern when its customers were acquired.

The Debtor was obviously not a going concern at the time of execution of the employment agreements and covenants not to compete. Its plant had been closed for three weeks, its factory force had been terminated, and its pending purchase orders were being filled by others. With many businesses, this alone would have caused customers to go to any number of competitors. That happened only partially here. This was because of the critical relationship between customer and salesman. But cessation of operations did operate to decrease the value of what little ability the Debtor had to transfer a customer's business to another manufacturer when the salesman went elsewhere. The Debtor was then under a compulsion to attempt to make the transfer. Compulsion to sell traditionally lowers value. *See* Pratt, *supra,* at 22–23.

Having all these considerations in mind, I conclude the Trustee has not sustained his burden to establish the value of the business acquired by the Defendant. In order for me to determine that value I would have to engage in pure speculation.