195 P.3d 645

**WARNE INVESTMENTS, LTD.,**
an Arizona corporation,
Plaintiff/Appellee,

v.

Sandra HIGGINS and Dennis Higgins, wife and husband; Bridge Info Tech, Inc., an Arizona corporation, Defendants/Appellants.

No. 1 CA–CV 06–0410.

Court of Appeals of Arizona, Division 1, Department C.

April 15, 2008.

Review Denied Sept. 23, 2008.

Tiffany & Bosco, P.A. by Robert A. Royal, Chad A. Hester, Phoenix, Attorneys for Plaintiff/Appellee.

Dyer & Butler, L.L.P. by Robert O. Dyer, Wayne B. Ducharme, Bryan M. Folger, Phoenix, Attorneys for Defendants/Appellants.

## OPINION

IRVINE, Judge.

¶1 Sandra Higgins ("Higgins"), Dennis Higgins, and Bridge Info Tech, Inc. ("Info Tech") (collectively "Appellants") appeal from a judgment holding them liable for paying the debts owed by Bridge IT, Inc. ("IT"). We agree with the trial court that Info Tech was properly found to be a mere continuation of IT and that Higgins was liable under the trust fund doctrine because she benefitted from preferential transfers made while IT was insolvent. We disagree, however, that Higgins was personally liable for the entire amount of IT's debt because the value of the intangible assets transferred to Info Tech was not proven. For the reasons that follow,

we affirm the judgment in part and reverse it in part.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Higgins founded IT in 1995. She was IT's president, majority shareholder, a director and its principal employee, and her spouse, Dennis, also served as a shareholder, director and officer. IT enjoyed increasing success, and in 2000 it had gross receipts of over $2,000,000. At one time IT had as many as twelve employees. Higgins was paid a salary by IT, and also received cash distributions in her capacity as IT's owner and via shareholder loans that totaled approximately $89,000 by the end of 2002. IT also established a company pension plan, which was funded with corporate funds and primarily benefitted Higgins and her husband.

¶ 3 As part of its business, IT entered into a contract with Warne Investments, Ltd. ("Warne") to construct Warne's web page. A contract dispute arose and Warne filed suit against IT (the "Warne Contract Action") in August 2001. During the course of the litigation, Higgins spent increasing amounts of her time on the dispute with the result that IT's business declined. Nevertheless, in September 2002, Sherilyn Janson ("Janson") was hired to run IT. Janson described any IT sales at that time as "negligible."

¶ 4 The Warne Contract Action went to trial on December 19, 2002, and a jury returned a verdict against IT for $30,000. During the trial Higgins told James Warne, Warne's owner, that he would never get paid, and that she did not know why he was pursuing the trial because she would just close down IT if Warne prevailed.

¶ 5 Arguing that the damage award was too little, on February 11, 2003, Warne obtained an additur of $40,000, which IT rejected.[1] Consequently, the trial court ordered a new trial regarding damages. While the new trial was pending, the trial court entered a judgment on May 16, 2003, awarding Warne $44,572.30 for its attorneys' fees and costs incurred in the original trial. Making use of this judgment, Warne began to garnish IT's bank account in June 2003, resulting in the collection of approximately $3000.

¶ 6 The retrial on damages in the Warne Contract Action took place in October 2003. Neither IT nor Higgins appeared to defend at the retrial. The outcome was a second judgment awarding damages of $111,425.95, entered on October 7, 2003. At this point, Warne had two judgments against IT totaling $155,998.25.[2]

¶ 7 IT's tax return indicated that at the end of 2002 it had current assets consisting of $4874 in cash and $89,250 in loans to shareholders. IT's current liabilities totaled $99,850, of which $69,696 represented a pension contribution payable. IT's net worth at the end of 2002, representing the difference between total assets and total liabilities, was $299.

¶ 8 During 2003, IT continued to do business, but only with financial assistance from Higgins and her husband. A portion of the cash that Higgins paid into IT was used to pay the pension plan contribution that was due on February 27, 2003. The Higginses borrowed $75,000 on their personal equity line of credit secured by a mortgage on their residence, and deposited that sum into IT's account, which then paid the $69,696 pension contribution.[3] Higgins' salary from IT dur-

1. An additur is an order by the trial court increasing a damage award as a condition to denying a motion for new trial. *See* Black's Law Dictionary 41 (8th ed.2004) ("**additur.** A trial court's order, issued usu. with the defendant's consent, that increases the jury's award of damages to avoid a new trial on grounds of inadequate damages."). If the defendant rejects the additur, the new trial motion is granted. Ariz. R. Civ. P. 59(i)(1); *Bustamante v. Tucson*, 145 Ariz. 365, 366–67, 701 P.2d 861, 862–63 (App.1985) (finding trial court did not abuse its discretion by ordering new trial only on issue of damages

when defendant did not agree to proposed additur). In the Warne Contract Action, the trial court granted Warne's motion for new trial on the issue of damages because IT rejected the additur.

2. During this time, a former employee also secured a judgment for approximately $110,000 against IT.

3. In 2002, IT did not have sufficient funds to make the pension contribution that was due on September 15, 2002, so Higgins' husband bor-

ing 2003 totaled $41,089, but IT's records show that she received little cash because her salary after taxes and deductions was treated as repayment of shareholder loans. By the end of 2003, the shareholder loans had been reduced to zero. Higgins states on appeal that when the cash deposits and foregone salary are totaled, she and her husband paid approximately $152,000 into IT in 2003. In addition, IT completely exhausted its $50,000 line of credit, which was personally guaranteed by Higgins.

¶ 9 After Warne garnished IT's bank account, IT essentially shut down. Higgins ensured that all IT's outstanding jobs were completed, new work was undertaken by Info Tech, not IT. Higgins incorporated Info Tech on July 15, 2002, but the new corporation remained inactive until the summer of 2003. Higgins explained her decision to make Info Tech operational:

A. Well, once the [IT] bank accounts were garnished, we never—Sherilyn and I never executed the plan as it was intended for Bridge Info Tech because we were too busy with the litigation. She was trying to run Bridge IT, so we never executed the plan. So by the time June came rolling around, they garnished our bank accounts, I told her, you know, you need to just—you got to go do what you got to do.

Q. Okay. You then began winding the operations down of Bridge IT and began shifting your personal energies to Bridge Info Tech?

A. No, I spent eight years building Bridge IT, I did not want it to fail.

Q. But it did?

A. It did.

Q. And at the point that it did, you shifted your own energy to the new company, did you not?

A. Yes.

rowed $40,757 from his employer's 401(k) plan and deposited that sum into IT's account. In September 2004, Warne attempted to garnish IT's pension account, but testimony at trial indicated that federal law limits the ability of a creditor to seek payment from a pension fund for

¶ 10 Both Higgins and Janson stopped providing services for IT in the summer of 2003, and Janson left to work for Info Tech by July or August 2003. Info Tech leased space in the same northeast Scottsdale area as IT did. Info Tech and IT had at least five of the same customers and three of the same business partners. It was undisputed that during the summer of 2003 Info Tech purchased some of IT's office equipment and paid fair market value of $2165.

¶ 11 Info Tech's ownership and operations were very similar to those of IT. Higgins and her husband owned both IT and Info Tech. Higgins served as a corporate officer and director of Info Tech, as she had of IT. Like IT, Info Tech was a Subchapter S corporation, which meant company profits were not subject to a corporate income tax, but were reported on Higgins' individual income tax returns. IT and Info Tech sold products such as Viador software and provided computer-related consulting services. The purpose of both entities was to provide business solutions to customers using information technology.

¶ 12 Higgins had drawn a salary from IT until the summer of 2003. After that she was officially an employee of Datasmart LLC, which was created as a vehicle to provide consulting services to and for Info Tech. Info Tech was Datasmart's only customer and Higgins was Datasmart's only employee. Datasmart (Higgins) was compensated by receiving payments measured by a division of the fees received by Info Tech for services after payment of Info Tech's expenses. During 2004 and 2005, Info Tech paid Datasmart an average of $96,000 per year for Higgins' services. Janson drew salaries from both IT and Info Tech for similar services as an employee. Her salary at Info Tech was measured by the net fees remaining after accounting for expenses and the payments to Datasmart/Higgins.

a debt of the sponsoring corporation or a plan beneficiary. Consequently, it appears that the plan assets are not available to satisfy the judgment in either the Warne Contract Action or this action.

¶ 13 On July 30, 2004, Warne sued Info Tech, along with Higgins and her spouse,[4] on theories of successor corporate liability, breach of the Uniform Fraudulent Transfer Act, Arizona Revised Statutes ("A.R.S.") sections 44–1001 to –1010 (2003) (the "UFTA"), and the corporate trust fund doctrine. Following Appellants' unsuccessful motion for summary judgment, the trial court conducted a four-day jury trial. The jury returned verdicts in favor of Warne and against Higgins on the trust fund doctrine ($46,000); against Info Tech on the UFTA claim ($100,-000); and against Info Tech on the successor liability claim. Based on the successor liability finding, the trial court entered a judgment against Info Tech for the $155,998.25 awarded against IT in the Warne Contract Action. The trial court's judgment specified that the total amount collected from Appellants would not exceed the $155,998.25 with interest commencing from October 7, 2003, the date of the second trial in the Warne Contract Action.

¶ 14 After further briefing, the trial court ruled as a matter of law that Higgins was personally liable under the theories of fraudulent transfer and successor corporate liability. Accordingly, the trial court entered judgment against Higgins in the amount of $155,998.25, representing the judgments for damages, attorneys' fees, and costs in the Warne Contract Action. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(1) and–2101(B), (F)(1), and (M) (2003).

### DISCUSSION

### I. INFO TECH'S LIABILITY.

¶ 15 Info Tech maintains that the trial court erred by denying its motions for judgment as a matter of law on both the successor corporate liability and UFTA claims. A claim is properly submitted to the jury when evidence exists to justify, but not necessarily compel, an inference of liability. *Robledo v. Kopp*, 99 Ariz. 367, 371, 409 P.2d 288, 291 (1965). On appeal from a denial of a motion for judgment as a matter of law, "we view the evidence and all reasonable inferences [from it] in a light most favorable to the non-moving party." *Piper v. Bear Med. Sys., Inc.*, 180 Ariz. 170, 173, 883 P.2d 407, 410 (App.1993).

¶ 16 In Arizona, the general rule for successor liability is when a corporation sells or transfers its principal assets to a successor corporation, the successor corporation is not liable for the former corporation's debts and liabilities. *A.R. Teeters & Assocs., Inc. v. Eastman Kodak Co.*, 172 Ariz. 324, 329, 836 P.2d 1034, 1039 (App.1992). Legal responsibility exists only if (1) the successor corporation expressly or impliedly agreed to assume the liabilities of the predecessor corporation; (2) the alleged transactions between the two companies amounted to a consolidation or merger of the corporations; (3) the successor corporation is a mere continuation or reincarnation of the predecessor corporation; or (4) clear and convincing evidence shows that the transfer of assets from the predecessor corporation to the successor corporation was for the fraudulent purpose of escaping debt liability. *Id.*

¶ 17 We can affirm the successor liability judgment against Info Tech if any one of the four grounds is present. We find that the record contains evidence sufficient for the jury to conclude that Info Tech was a successor corporation to IT under the mere continuation exception recognized in *Teeters*. Therefore, we address only that ground for liability.

¶ 18 The mere continuation grounds for finding successor liability "reinforces the policy of protecting rights of a creditor by allowing a creditor to recover from the successor corporation whenever the successor is substantially the same as the predecessor." *Gladstone v. Stuart Cinemas, Inc.*, 178 Vt. 104, 878 A.2d 214, 222, ¶ 19 (2005) (citing William M. Fletcher, 15 *Fletcher Cyclopedia Corp.* § 7124. 10, at 298–301 (1999)). The premise of this approach "is that, if [a] corporation goes through a mere

---

4. Higgins' husband was dismissed as a defendant shortly before trial except to the extent he owns community property with his wife.

change in form without a significant change in substance, it should not be allowed to escape liability." *Id.* To find a corporation is a mere continuation of a predecessor corporation there must be "a substantial similarity in the ownership and control of the two corporations," and "insufficient consideration running from the new company to the old" for the assets passing to the new company. *Teeters*, 172 Ariz. at 330, 836 P.2d at 1040.

¶ 19 IT and Info Tech had identical or substantially similar directors, officers, and stockholders.[5] IT and Info Tech bore similar names (Bridge IT/Bridge Info Tech), provided the same services, and Higgins and Janson admitted there was no real difference between the companies. Info Tech served IT's customers, had three of the same business partners, and Higgins and Janson provided software services and support under Info Tech's name. *See Bogart v. Phase II Pasta Machs., Inc.*, 817 F.Supp. 547, 548–49 (E.D.Pa.1993) (finding the mere continuation form of successor liability because the second company had the same officers, directors, customers, location, and goodwill); *Gladstone*, 878 A.2d at 222–24, ¶¶ 20–24 (finding a mere continuation and holding that continuity of management and ownership were the most important factors and the business of the successor corporation need not be exactly the same as the predecessor if the nature is the same); *Pottschmidt v. Klosterman*, 169 Ohio App.3d 824, 865 N.E.2d 111, 119–20, ¶ 31 (2006) (finding a mere continuation because both corporations were owned and operated by the same person utilizing the same employees, in the same building, and serving substantially the same patients).

¶ 20 In addition, Warne's valuation expert, Elizabeth Monty ("Monty"), testified that Info Tech's position as a continuation and successor of IT was reflected in the transfer of services, employees, customers, goodwill, and related values associated with such assets. She relied on her own review of the companies' similarities, shared financial history, and the financial benefit Higgins derived from the two companies. Because both companies were service businesses that did not generate revenue from use of tangible assets, Monty opined that the value of the transfer was in Info Tech's income stream. In effect, IT's going concern value[6] was transferred to Info Tech, which used that value to quickly become a going concern itself.

¶ 21 It is undisputed that Info Tech did not pay IT for the transfer of intangible assets. Nevertheless, IT's intangible assets—primarily the going concern value of the contacts, skills, and knowledge of Higgins and Janson—enabled both companies to survive.[7] Higgins made a decision to transfer her contacts, skills, and knowledge to Info Tech to run a profitable company without interference from Warne's garnishment proceedings against IT. She took with her a key employee of IT, who became a key employee, but not an owner, of Info Tech. This evidence was enough for the jury to find Info Tech liable as a mere continuation of IT.

¶ 22 Info Tech contends, however, that the finding of successor corporate liability cannot be premised upon the transfer of intangible

---

**5.** Contrary to Appellants' assertion, Janson was not president of Info Tech. The 2003 report filed with the Arizona Corporation Commission lists Higgins as Info Tech's president. Higgins was also serving as IT's president when that company ceased operations and Info Tech began operations.

**6.** "[G]oing-concern value. The value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets." Black's Law Dictionary 1587.

**7.** Monty testified that IT's intangible assets included (1) customer-related intangible assets, such as customer lists and records, customer relationships, customer credit files and charts, (2) human capital-related intangible assets, such as an in-place workforce, skilled and key employees, and (3) goodwill, which includes the going concern premise of a business, the existence of excess economic income, and the expectation of future events not directly related to current operations. For our general purposes, we consider all of these intangible assets to be forms of goodwill. See Black's Law Dictionary 715 ("**goodwill.** A business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets.").

assets from IT to Info Tech. The trial court rejected this argument, and so do we.

¶ 23 Courts have held that successor corporate liability can apply even if the only assets transferred are intangible. In *Bogart* the district court imposed liability even though only intangible assets were transferred, such as goodwill and a customer list. 817 F.Supp. at 548–50. Similarly, a bankruptcy court relied upon *Bogart* to reach the same conclusion in *Ross Controls, Inc. v. United States Department of Treasury,* 164 B.R. 721, 727 n. 6 (E.D.Pa.1994) ("A transfer of intangibles—including customer contracts and lists—satisfies the rule."). Moreover, the Vermont Supreme Court imposed successor liability even while recognizing that the assets transferred were "relatively minor" and "largely intangible." *Gladstone,* 878 A.2d at 225, ¶¶ 30–31. There, the intangible assets included a manager's decision-making resulting in access to films for public viewing, expertise in selecting films, and goodwill. *Id.* at ¶ 30.

¶ 24 Info Tech contends that *Bogart's* analysis of product liability for personal injuries sustained from equipment sold by a predecessor company is inapplicable here. We reject this distinction and note that this court recently found that the rule formulated for product liability actions, Restatement (Third) of Torts: Products Liability § 12 (1998), "is essentially the same as that announced earlier in *Teeters*" for personal injury actions. *Winsor v. Glasswerks Phx, L.L.C.,* 204 Ariz. 303, 308, ¶ 15, 63 P.3d 1040, 1045 (App.2003).

¶ 25 Equally unavailing is Info Tech's reliance upon *Rockman v. E. Container Corp. (In re Corrugated Paper Corp.),* 185 B.R. 667 (Bankr.D.Mass.1995). That case dealt with the goodwill associated with particular sales employees of the debtor, not the debtor's principals. *Id.* at 671. The Chapter 7 trustee alleged "fraudulent transfer of goodwill, conversion of goodwill and unfair and deceptive business practices" against the debtor's competitor in an attempt to recover the goodwill the debtor's competitor obtained by hiring the debtor's former sales representatives. *Id.* at 669–70. The case does not discuss successor liability, nor did it deal with, as the trial court put it in this case, a principal's professional goodwill in terms of contacts and experience.

¶ 26 We recognize that goodwill is "the most 'intangible' of the intangibles." *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1, 3 (1983). Nevertheless, in *O'Hara v. Lance,* 77 Ariz. 84, 87, 267 P.2d 725, 727 (1954), the Arizona Supreme Court held that goodwill is an element responsible for business profits. Goodwill is a corporate asset as subject to bargain and sale as is tangible property. *Id.* In this case, Monty opined that the transfer of intangible assets included professional skills, word of mouth advertising, marketing and business contacts, and relationships as well as trained workers. This evidence was sufficient to properly submit to the jury the issue of successor liability as a mere continuation.

¶ 27 Info Tech also argues that the failure to define the value of the transferred assets is fatal to Warne's claim for successor liability. We disagree. Although Monty did not opine as to the value of the intangible assets transferred, we find no authority requiring that successor liability as a mere continuation requires proof of the value of the transferred assets. A plaintiff is merely required to show that there was insufficient compensation paid for those assets. Here, it is undisputed that Info Tech paid nothing for IT's intangible assets. Consequently, although the going concern value of IT was undefined, the jury had sufficient evidence to conclude that Info Tech acquired whatever value existed. This is enough to support mere continuation successor liability.

¶ 28 To hold otherwise would mean that a service business that repeatedly reorganizes itself into a new corporate form could escape liability simply by arguing that the tangible assets of the business were de minimis and the income stream was not touchable. We believe imposing liability as a mere continuation is intended to avoid this very scenario. A plaintiff must still prove that the value of the first corporation was transferred for less than sufficient consideration, but it is for the trier of fact to decide whether intangible assets were available to be transferred. In this case, the evidence that IT's intangible

value as a going concern was transferred to Info Tech without payment of sufficient value was sufficient to support the jury's finding of successor liability.

¶ 29 We recognize that much of IT's going concern value was derived from the personal experience, contacts and knowledge of Higgins and Janson, and that IT did not own its employees or have employment contracts with them. Higgins and Janson could have taken jobs with unrelated companies, serving different clients, and it would be difficult for Warne to argue that IT' s debts became those of the new employers. Nevertheless, that is not what occurred. Instead, IT's business, including its owners, key employees and services, was essentially reconstituted as Info Tech. Under these circumstances, Info Tech stepped into the shoes of IT. Therefore, we affirm the trial court's rulings finding Info Tech liable for the judgments entered against IT in favor of Warne.[8]

## II. HIGGINS' PERSONAL LIABILITY.

¶ 30 Higgins was found personally liable under two theories. First, the jury found Higgins liable for $46,000 in damages under the trust fund doctrine. Second, the trial court found Higgins liable as a matter of law for the full amount of the liability imposed on Info Tech because Higgins was personally responsible for transferring the value of IT to Info Tech. We address each liability theory in turn.

### A. Trust Fund Doctrine.

¶ 31 The trust fund "doctrine was judicially created to ensure that all creditors' claims are first equitably satisfied before stockholders may claim their rights upon the assets of an insolvent corporation." *Teeters*, 172 Ariz. at 331, 836 P.2d at 1041. In this case, liability under the trust fund doctrine requires evidence "that (1) corporate assets were transferred to [Higgins], (2) the transfer of corporate assets occurred while the corporation was insolvent, and (3) the transfer preferred [Higgins] to the disadvantage

of other creditors of the same priority." *Id.* Additionally, "[l]iability . . . is limited to the value of the assets received by the director, officer, or stockholder." *Id.*

¶ 32 Warne argues that evidence of IT's transfers to Higgins in the form of salary and the funding of a pension plan are sufficient to support the jury finding of liability under the trust fund doctrine. Warne also points to the transfer of intangible assets from IT to Info Tech as an alternative basis to support the verdict. Higgins claims the trial court erred by denying the motion for judgment as a matter of law and motion for a directed verdict on this issue and by denying the motion for new trial.

¶ 33 "Judgment as a matter of law lies where 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' Ariz. R. Civ. P. 50(a). In other words, the trial court properly grants the motion 'if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.'" *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 162, ¶ 36, 158 P.3d 877, 885 (App.2007) (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990)). We review rulings on a motion for judgment as a matter of law and a motion for directed verdict de novo. *Id.; Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997). In addition, "we view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* We review the denial of a motion for new trial under an abuse of discretion standard. *Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996).

¶ 34 We first address whether there was evidence that IT was insolvent at the times transfers were made that benefitted Higgins. Higgins argues that IT was not insolvent until after the second trial in the Warne Contract Action in October 2003, when the

---

8. Our decision removes the need to consider whether the evidence supports other theories of successor liability. Moreover, we find it unnecessary to address the trial court's refusal to give Appellants' proposed jury instruction defining a fraudulent purpose for successor liability purposes because the evidence supported the alternative mere continuation theory of liability.

judgments against IT became final. She argues that because the May 15, 2003 judgment did not fully adjudicate all of the claims before the trial court and did not contain the language required by Rule 54(b) of the Arizona Rules of Civil Procedure to be a final judgment, Warne could not properly execute the judgment against IT. Therefore, Higgins posits that IT was solvent until a final judgment was entered. Warne responds that the May 2003 judgment was plainly enforceable because it was the basis for the garnishment the next month.

¶ 35 Arizona Revised Statutes § 10–140(29) (2004) defines insolvent as the "inability of a corporation to pay its debts as they become due in the usual course of its business." Higgins argues that IT was solvent because it was paying its obligations as they fell due, and it was only when the judgments became final in October 2003 that IT was not able to pay its legal obligations. She states that the pension contribution was paid with personal funds and that her last salary payment was in August 2003, before the judgments were entered.

¶ 36 Higgins' argument is undercut by several facts. First, at the end of 2002, IT's net worth was $299. This amount does not take into account the December 2002 jury verdict for $30,000 in the Warne Contract Action. Although this verdict was not yet final, we see no reason why the jury could not take it into account in considering whether IT was insolvent. *See Hullett v. Cousin*, 204 Ariz. 292, 296, ¶¶ 16–17, 63 P.3d 1029, 1033 (2003) (interpreting the UFTA to hold that insolvency may be based on debts that have not been reduced to a judgment and even contingent claims may be considered in a solvency analysis if there is a likelihood that the contingency will occur). By the end of 2002, the amount of the debt to Warne may have been uncertain, but there was little doubt that there would be liability for a significant amount. Consequently, the dispute between Warne and Higgins regarding whether the May 2003 judgment was a final judgment is immaterial.

¶ 37 Next, it is apparent that IT stayed afloat as long as it did only because Higgins continued to put cash into it. The pension contribution could not have been paid if Higgins did not deposit cash into IT's account. This does not mean, as Higgins argues, that the contribution was made with Higgins' personal funds. Whether paid as a partial repayment of the shareholder loans or as an additional capital contribution, once Higgins put cash into IT's account it belonged to IT. Moreover, IT's cash needs did not end with the pension contribution. As Higgins admits, to keep IT going she had to put approximately $152,000 into IT in 2003. After deducting the $69,696 pension contribution, that still leaves approximately $80,000, plus the additional draws on the credit line, as being necessary for IT's operations. Without these funds, IT was not able to pay its debts in the usual course of business.

¶ 38 The issue before us is whether the jury could reasonably find that IT was insolvent for purposes of the trust fund doctrine when it made transfers that benefitted Higgins. In light of IT's own balance sheet and records, we conclude that the jury could reasonably conclude that IT was insolvent from December 2002 when the jury in the Warne Contract Action found IT liable for breach of contract.

¶ 39 We now address whether there were transfers that benefitted Higgins. Higgins concedes that IT provided her with a salary and made payments to a pension plan for her benefit. IT's records show the salary paid to Higgins in 2003 was mostly offset against the outstanding shareholder loans, so little or no cash was actually paid to Higgins. The same records show that the salary recorded as being paid in 2003 and late 2002, after the first verdict in Warne's favor was rendered on December 19, 2002, was roughly equivalent to the amount of the jury verdict in this case. When combined with the payment of the debt owed to the pension plan, these amounts are sufficient to support the jury's verdict.[9]

9. Because the amounts of the salary payments and pension contributions exceeded the jury's verdict, we need not consider whether the intangible assets transferred to Info Tech would be considered a transfer to Higgins under the trust fund doctrine.

196

¶ 40 Higgins argues that the salary payments should not be considered under the trust fund doctrine because they are preferred payments under A.R.S. § 23–354. That statute, however, applies only to "the wages of salesmen, clerks or laborers . . . to the amount of two hundred dollars each," so it is difficult to see how it applies to this situation. A.R.S. § 23–354(A) (1995). To the extent Higgins is arguing that the wages were reasonable compensation for the work she did for IT, her argument would be more persuasive if the wages were actually paid in cash and she was dependent upon her salary to support herself. Instead, the salary payments were used to reduce her shareholder loans, which were the only significant asset of IT at the time of the first verdict in the Warne Contract Action. In any event, whether the salary payments represented reasonable compensation was a question for the jury.

¶ 41 Higgins also argues that no evidence was presented that the pension contribution was improper. This argument misses the mark. The trust fund doctrine requires only that the transfer prefer a corporation's owners over other creditors, not that the transfer be improper, illegal, or fraudulent. There is no dispute that the pension plan was valid. The issue before us is whether the jury could reasonably consider the pension contribution in deciding liability under the trust fund doctrine. We conclude that it could.

¶ 42 Therefore, we find that the trial court did not err in denying the motion for judgment as a matter of law or motion for directed verdict. We also find that the trial court did not abuse its discretion in denying the motion for new trial on this issue. The judgment imposing liability on Higgins under the trust fund doctrine is affirmed.

**B.  Liability Under the UFTA and Successor Liability.**

¶ 43 The trial court also found Higgins was personally liable for Info Tech's obligations to Warne under the UFTA and the successor liability doctrine. Its ruling was based on Higgins' statement to Warne that she would close IT down rather than pay him and its finding that she "arranged for the transfer of [intangible] assets, for less than the value, to the new corporation to carry on the same business with the same employees." Higgins argues that this ruling was in error because there is no authority for holding an officer, director, or shareholder personally liable for causing a fraudulent transfer to a successor corporation under either fraudulent transfer theories or the successor liability doctrine.

¶ 44 Warne responds that because Higgins facilitated the transfer, she is personally liable for the transfer. Warne argues that Higgins is personally liable for the transfer under the UFTA and under the doctrine of successor liability because her actions hindered the ability of Warne to collect the judgment against IT.

¶ 45 We first address whether the UFTA supports the trial court's ruling that Higgins is personally liable for Info Tech's obligation under the UFTA. The UFTA provides specific enumerated remedies for creditors. A.R.S. § 44–1007(A). The enumerated remedies allow "[g]arnishment against the transferee, [a]voidance of the fraudulent transfer, . . . . attachment . . . against the asset transferred, . . . . injunction against further disposition . . . of the asset transferred, . . . . [or] [a]ppointment of a receiver to take charge of the asset transferred." *Id.* All of these remedies address a creditor's rights against the transferee or the transferred asset. Because Info Tech, not Higgins, was the transferee of IT's intangible assets, these remedies are not enforceable against Higgins, but only against Info Tech or the transferred assets.

¶ 46 The UFTA, however, also provides for "[a]ny other relief the circumstances may require." *Id.* While Arizona state courts have not squarely addressed the scope of this catch-all provision, Arizona law has been interpreted by the federal district court as not providing an "independent cause of action for aiding and abetting a fraudulent transfer." *Mann v. GTCR Golder Rauner, L.L.C.*, 483 F.Supp.2d 884, 918 (D.Ariz.2007). Moreover, courts in other jurisdictions have consistently interpreted the catch-all language of the UFTA as not providing a cause of action for aiding and abetting a fraudulent transfer.

E.g., *Freeman v. First Union Nat'l Bank,* 865 So.2d 1272, 1276 (Fla.2004); *accord Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.),* 377 F.Supp.2d 390, 417 (S.D.N.Y. 2005); *Rohm & Haas Co. v. Capuano,* 301 F.Supp.2d 156, 161 (D.R.I.2004); *Litchfield Asset Mgmt. Corp. v. Howell,* 70 Conn.App. 133, 799 A.2d 298, 308–09 (2002); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 203 (Del.Ch.2006).

¶ 47 In *Freeman,* the Florida Supreme Court interpreted the catch-all provision and held that the "Legislature intended it to facilitate the use of the other remedies provided in the statute, rather than creating new and independent causes of action such as aider-abettor liability." 865 So.2d at 1276. The court examined the language of the statute and found that "[o]n the face of the statute, there [wa]s no ambiguity with respect to whether [the] [ ]UFTA create[d] an independent cause of action for aiding-abetting liability." *Id. Freeman* reasoned that "[t]here simply [wa]s no language in [the] [ ]UFTA that suggest[ed] the creation of a distinct cause of action for aiding-abetting claims against non-transferees." *Id.* Rather, the court noted, the UFTA "was intended to codify an existing but imprecise system whereby transfers that were intended to defraud creditors could be set aside." *Id.*

¶ 48 We agree with the reasoning of the Florida Supreme Court in *Freeman* that the catch-all provision does not give rise to an "independent cause of action for aiding-abetting liability." 865 So.2d at 1276. Therefore, we hold that the UFTA does not provide an independent cause of action for aiding-abetting liability against Higgins.

¶ 49 The remaining basis for the trial court's decision to impose personal liability on Higgins for the transfer of assets to Info Tech was the doctrine of successor liability. As discussed above, we agree that successor liability appropriately applies to make Info Tech liable for IT's debts as a mere continuation of IT. Info Tech's liability does not, however, automatically transfer to its officers or directors, or to the officers and directors of IT.

¶ 50 It is undisputed that Higgins was not personally liable for the judgments against IT in the Warne Contract Action. She had no duty to personally pay IT's debts or keep IT going until all its debts were satisfied. Higgins may have intended to leave IT's debt to Warne unpaid when IT shut down, but that intention by itself was not sufficient to impose personal liability on Higgins.

¶ 51 Warne argues that Higgins opened herself to personal liability through her actions in transferring the intangible assets in an attempt to hinder Warne's ability to collect its judgments against IT. *See, e.g., Stoumbos v. Kilimnik,* 988 F.2d 949, 963 (9th Cir.1993). We agree that under some circumstances a corporate officer or director may be personally liable for torts committed by a corporation if the officer or director personally participates in the tort. *Dawson v. Withycombe,* 216 Ariz. 84, 101, ¶ 46, 163 P.3d 1034, 1051 (App.2007) ("Under Arizona law, a director cannot be liable without some kind of personal participation in the tort or at least acquiescence by knowledge of the tort combined with a failure to act."). In light of our conclusion that the UFTA does not provide for aiding and abetting liability, it is unclear to us whether the general doctrine regarding personal liability for corporate torts applies to fraudulent transfers that are subject to the UFTA.[10] In any event, even assuming the doctrine applies, there is no evidence in this case that Higgins' actions actually hindered Warne's collection efforts because Warne presented no evidence of the actual value of the intangible assets.

¶ 52 To impose personal liability on Higgins, based on the transfer of assets to Info Tech, Warne was required to show that the transfer of intangible assets from IT to Info Tech "had an effect on its ability to collect from" IT or "put it in a worse position than it was before the creation of" Info Tech. *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.,* 85 Wash.App. 695, 934 P.2d 715, 722 (1997). As explained by the Washington Supreme Court:

10. In *Moore,* 203 Ariz. at 108, ¶ 20, 50 P.3d at 858, we held that the UFTA "displaced any common law cause of action for fraudulent conveyance."

198

The tortfeasor and the tort victim take one another as they are. Plaintiff is not entitled to a solvent defendant, and cannot be allowed to create one by asserting disregard of the corporate entity when the activities, which admittedly otherwise might justify disregard, have had no effect on the plaintiff's ability to collect a judgment from the defendant corporation at the time the doctrine is asserted. Disregard assumes that unjustified loss would occur to the individual to whom the duty is owed if the entity were not disregarded. No loss of corporate assets has been suffered by the plaintiff here as a result of the defendant's actions.

*Morgan v. Burks,* 93 Wash.2d 580, 611 P.2d 751, 757 (1980). In *Morgan,* the court found personal liability was inappropriate because the corporate assets that the shareholders attempted to transfer to themselves had been returned to the corporation and were available to satisfy creditors' claims. *Id.* at 757–58. Here, there is no evidence that the intangible assets of IT had any marketable value that Warne could have executed against, garnished, or otherwise converted into cash to satisfy IT's debt. Consequently, there is no evidence that Warne's collection efforts were actually hindered.

¶ 53 A common component of laws relating to fraudulent or preferential transfers is that liability is limited to the value of the assets transferred. For example, under the UFTA if a transfer is not voidable because the assets have been depreciated or sold "the creditor may recover judgment for the value of the asset transferred ... or the amount necessary to satisfy the creditor's claim, whichever is less." A.R.S. § 44–1008(B). Similarly, we have held that the amount of damages in an action based on conspiracy to commit a fraudulent conveyance are "the value of the property fraudulently transferred or the amount of the debt, whichever is less." *McElhanon v. Hing,* 151 Ariz. 386, 394, 728 P.2d 256, 264 (App.1985), *aff'd in part and vacated in part on other grounds,* 151 Ariz. 403, 728 P.2d 273 (1986); *see also Teeters,* 172 Ariz. at 331, 836 P.2d at 1041 (under the trust fund doctrine applicable to preferential transfers "[l]iability ... is limited to the value of the assets received by the director, officer, or stockholder."). We conclude that this limit applies in this case. Therefore, Warne was required to show not only that Higgins was responsible for transferring intangible assets between IT and Info Tech, but also the value of the property transferred.

¶ 54 This conclusion may seem at odds with our earlier holding that a general assertion of value was sufficient to support imposing liability on Info Tech as a mere continuation of IT. We conclude, however, that the difference is justified because the legal tests at issue are based on different policies and purposes. The elements of successor liability as a mere continuation do not require defining the value, nor is the liability of the successor corporation limited to the value transferred. Because the successor corporation steps into the shoes of its predecessor, there is nothing remarkable in holding the successor liable for all the debts of the predecessor.

¶ 55 In contrast, personal liability of an officer or director is an exception to the ordinary rule of limited liability. As noted above, one component of the exceptional nature of imposing personal liability is that the liability is limited to the value of the assets transferred. By limiting liability to the value of the transferred assets, the creditor is placed in essentially the same position that it was before the transfer. The value of the assets available to satisfy the debt after the transfer is no greater than the value of the corporation's assets that were available for collection before the transfer.

¶ 56 After Warne garnished IT's bank account, IT essentially shut down. It had minimal cash flow and a negative net worth. At that point IT had little against which Warne could collect. Neither Higgins nor Janson could be forced to continue working for IT, and were unlikely to do so if IT's revenues were used to pay Warne instead of their salaries. Warne argues that "but for Higgins['] actions in transferring IT's business, service, contacts, sales and skills to Info Tech, IT would still be a viable company and capable of satisfying the Warne Judgment." The record simply does not support this assertion. After the garnishment, IT was not

going to continue. Consequently, IT's value as a going concern, if any, was speculative at best, given that Higgins had chosen to shut down the company.

¶ 57 Warne argues that evidence of the value of the intangible assets is Info Tech's gross receipts because Info Tech could not have been as successful as it was without those assets. We reject this argument. Although the evidence established that Info Tech benefited from the intangibles that passed to it from IT, this evidence did not quantify the value of the intangible assets when IT possessed them. Because the issue is whether Warne's collection efforts were hindered by transferring the assets, the focus of our inquiry must be what value the assets had to Warne if it had been able to reach them while they were still in IT's possession.[11]

¶ 58 At trial, Warne did not even attempt to place a value on the intangible assets associated with IT, but simply asserted that they had value and that value was transferred to Info Tech. For purposes of imposing personal liability on Higgins, this was insufficient to satisfy Warne's burden of proving the value of the transferred asset. Without such proof, personal liability cannot be sustained because there is no proof of what, if anything, was taken away from IT to hinder Warne's collection efforts.[12]

¶ 59 Consequently, we conclude that the trial court erred in imposing personal liability on Higgins as a matter of law. Therefore, we reverse the portion of the judgment doing so.

### III. THE RULINGS ON ATTORNEY–CLIENT PRIVILEGE RESULTED IN NO PREJUDICE.

¶ 60 Finally, Higgins contends that the trial court erroneously found that she waived the attorney-client privilege during her deposition and erred in allowing Warne's counsel to question her about letters her former counsel, R.N., wrote to IT. The trial court has broad discretion in ruling on discovery matters, including the assertion of the privilege, and we will not reverse absent an abuse of that discretion. *See Brown v. Superior Court,* 137 Ariz. 327, 331–32, 670 P.2d 725, 729–30 (1983).

¶ 61 The record reflects that the trial court marked R.N.'s records, Exhibit 19, and Warne's counsel used the exhibit in an unsuccessful attempt to refresh Higgins' recollection, but did not read the document out loud. Warne's counsel then withdrew the evidence during the conference on jury instructions on the final day of trial. We fail to see what possible prejudice Appellants sustained as a result of the privilege rulings. Consequently, we decline to reverse on this basis.

### CONCLUSION

¶ 62 We affirm the trial court's judgments against Info Tech and the judgment against Higgins under the trust fund doctrine. We reverse the remainder of the judgment against Higgins for personal liability.

CONCURRING: MAURICE PORTLEY, Presiding Judge, and DONN KESSLER, Judge.

---

11. Moreover, Warne also failed to quantify what portion of Info Tech's receipts, if any, were attributable to IT's assets. There were plainly expenses associated with performing the work, and as noted above, IT did not own the labor of Janson or Higgins. They would not have worked for Info Tech without compensation and there is no evidence that their compensation was not reasonably related to the value of their labor.

12. Our ruling on this issue calls into question whether there was sufficient evidence to support the jury's verdict against Info Tech under the UFTA because damages under the UFTA are limited to the value of the assets transferred. A.R.S. § 44–1008(B). Because we find the judgment against Info Tech was fully supported by the jury's finding that Info Tech was a mere continuation of IT, we need not address that issue.