375 P.3d 1173

**KEG RESTAURANTS ARIZONA, INC., et al., Plaintiffs/Appellants,**

v.

**William JONES, et al., Defendants/Appellees.**

No. 1 CA–CV 15–0054

Court of Appeals of Arizona, Division 1.

FILED 6/2/2016

Quarles & Brady LLP, Phoenix, By Jeffrey H. Wolf, Lauren Elliott Stine, D. Cody Huffaker, Strasburger & Price, LLP, Dallas, By Jadd F. Masso, Scott A. Shanes (attorneys admitted pro hac vice), Counsel for Plaintiffs/Appellants.

Snell & Wilmer LLP, Phoenix, By Robert A. Henry, Kelly A. Kszywienski, Counsel for Defendants/Appellees.

Judge Randall M. Howe delivered the opinion of the Court, in which Presiding Judge Kent E. Cattani and Judge Kenton D. Jones joined.

## OPINION

HOWE, Judge:

¶ 1 Keg Restaurants Ltd. ("Keg Limited"), Keg Restaurants U.S., Inc. ("Keg U.S."), Keg Franchise U.S., Inc. ("Keg Franchise"), and Keg Restaurants Arizona, Inc. ("Keg Arizona") (collectively, "Keg") appeal the trial court's denial of their motion for judgment as a matter of law ("JMOL") and for a new trial and the court's award of $5,913,301.40 to William and Fabienne Jones, Tucson Oro Valley Keg, LLC, and OVM Keg Land, LLC (collectively, "TOVK"). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In March 2011, Keg sued TOVK for compensatory and punitive damages from acts that arose from the parties' agreements to build a Keg-brand restaurant in Tucson, Arizona. As amended, Keg alleged claims of breach of three agreements and anticipatory breach of two agreements. Keg also alleged tort claims of negligent misrepresentation and fraudulent inducement and promissory fraud. TOVK counterclaimed, alleging claims of breach of four agreements, the covenant of good faith and fair dealing, and fiduciary duty. TOVK also alleged alter-ego liability and tort claims of negligent misrepresentation, fraud, fraudulent concealment, fraudulent inducement, and unjust enrichment. Before trial, the court dismissed all the parties' tort claims on summary judgment, and at trial, the jury found Keg Limited liable for the acts of its subsidiaries in breaching the parties' agreements. Keg renewed its JMOL motion and alternatively moved for a new trial, and the trial court denied both motions. The sequence of events between Keg and TOVK explains the jury's verdicts in finding Keg Limited liable for the acts of its subsidiaries and the trial court's decision to enter judgment in favor of TOVK.

### 1. The Keg Entities

¶ 3 "The Keg Steakhouse + Bar" is a casual steakhouse restaurant chain in Canada. Keg Rights Limited Partnership, a Canadian limited partnership, owns the trademarks and trade names and proprietary rights associated with the Keg restaurant system. Keg Rights licensed Keg Limited, a separate Canadian company, to use and sublicense other entities' use of the trademarks, trade names, and proprietary rights in connection with the Keg restaurant system. Keg Limited sells "The Keg Steakhouse + Bar" franchises in Canada.

¶ 4 Keg U.S., a Delaware corporation, is a wholly-owned subsidiary of Keg Limited and is sublicensed to use and to sub-sublicense the trademarks. In that regard, Keg U.S. sub-sublicensed its subsidiary, Keg Franchise, to use and to sub-sublicense to its franchisees the rights to use the trademarks. Keg Franchise sells "The Keg Steakhouse + Bar" franchises in the United States. In addition to the independent franchises, Keg U.S. owns and operates subsidiaries in the United States, including Keg Arizona, which owns and operates several Keg restaurants in Arizona. Keg Limited, Keg U.S., Keg Franchise,

and Keg Arizona—all separate business entities—have the same business address in British Columbia, Canada.

¶ 5 As far as the record reveals, the individuals employed by Keg have the following titles. David Aisenstat is Keg Limited's and Keg Franchise's President, Chief Executive Officer ("CEO"), and Director, but also signed documents as Keg U.S.'s and Keg Arizona's President and CEO. James Henderson is Keg Limited's Vice President of Business Development, but also signed documents as Keg U.S.'s Executive Vice President of Business Development and Keg Franchise's Vice President of Business Development. Andrea Janzen is employed by Keg Limited as its Director of Real Estate Development, but "do[es] work on behalf of those other entities." Neil MacLean is Keg Limited's Chief Financial Officer and all four entities' Secretary. Catherine Chow is Keg Limited's Director of Legal Services. Bruce Sanford "assume[s]" that he was employed by Keg Limited and works as a project manager for corporate stores and merely assists "franchisee[s] to do their project management."

## 2. The Agreement to Build a Keg Restaurant and the Subsequent Construction Process

¶ 6 In 2005, Jones and Michael Ratz, a general manager at Keg Limited, talked about establishing a Keg franchise in the United States. They then met with Aisenstat and Henderson to discuss the opportunity. In August 2005, Aisenstat, Henderson, and Janzen flew from Canada to Tucson, Arizona, to meet with their real estate agent and Ratz and Jones in exploring potential locations for a restaurant.

¶ 7 After the trip, Janzen sent a memorandum to Jones and Ratz, copying Aisenstat and Henderson, summarizing the locations they were shown, but stating that "[w]e wholeheartedly agree" with selecting a Vestar development, Oro Valley Marketplace, as the location. Janzen also stated that "[w]e believe the quality of Vestar's developments, as well as our strong relationship, makes this

an obvious long-term location in this market." Janzen concluded by stating that "we have already had discussions with Vestar and will work with them to secure the prime restaurant site in their development."

¶ 8 In December 2006, Vestar and Keg Arizona entered into a Ground Lease for a pad in the Oro Valley Marketplace; Aisenstat signed the lease as President and CEO of Keg Arizona. Keg U.S. guaranteed the lease, while Keg Limited guaranteed completion of its terms. Both guarantees were signed by Aisenstat as the entities' President and CEO and MacLean as the entities' Secretary and notarized by Chow. The Ground Lease required that Keg Arizona open the restaurant within one year of Vestar's completion of certain work. Once that work was completed, Vestar would turn the pad over to Keg Arizona.

¶ 9 In January 2008, TOVK entered into a "Restaurant Development Agreement" with Keg Franchise to develop and operate a Keg franchise on the land leased from Vestar. The agreement required TOVK to pay $50,000 to Keg Franchise, which Keg Franchise would refund, less expenses, up to $25,000, if the parties did not enter into a franchise agreement by January 15, 2010. Keg Arizona then subleased the existing Ground Lease between Keg Arizona and Vestar to TOVK. That same day, TOVK agreed to indemnify Keg Limited, which was not a party to the Ground Lease or Sublease, for any losses Vestar might incur for any breach of the Sublease. Both the Sublease and Indemnity Agreement were signed by MacLean as Secretary.

¶ 10 In April 2008, Vestar notified Janzen that the pad had been turned over to "The Keg"[1] for it to begin construction. Therefore, pursuant to the Ground Lease, Keg Arizona had a year from that date to finish construction. Chow then emailed Jones and Ratz an agency agreement to be returned to Keg Limited, appointing employees of "Keg Restaurants Ltd. and/or Keg Franchise U.S., Inc." as Jones' and Ratz's agents for the restaurant's construction ("2008 Agency

---

**1.** This Court uses "The Keg" in quotation marks when the record is unclear about which Keg

entity the document or individual was referring to.

Agreement"). The agreement provided Keg Limited and/or Keg Franchise "with full and absolute power and authority" to execute all acts necessary to construct the restaurant and "to transact any and all business for the development and construction of the Restaurant." It further stated that "[s]uch business may include without limitation, entering into contracts for goods and services for the development, construction and maintenance of the Restaurant, amending construction and design plans, directing suppliers and contractors, and performance of such other services as [TOVK] may request from time to time."

¶ 11 Before construction could begin, however, "The Keg" had to acquire building and grading permits from the City of Oro Valley. In November 2008, seven months after the pad had been turned over to "The Keg," the parties amended the Development Agreement to require that TOVK put in escrow $500,000 for construction costs and provide an additional fund of at least $1.5 million and to submit a commitment letter from a qualified lender for a loan of at least $3.25 million. The amendment also stated that if TOVK defaulted, under the terms of the Development Agreement or the amendment, Keg U.S. would refund TOVK's financial investment, less set-offs and deduction for losses, expenses, or costs arising from the default.

¶ 12 In late November 2008, Karson Builders, the construction manager Keg Limited hired, obtained the building permit—which TOVK paid for—but not the grading permit—which was the responsibility of Sanford, Keg Limited's project manager. Without the grading permit, Karson could not begin work and further grading work was required on the pad before the City would issue the permit. Vestar consequently extended the proposed opening date to November 2009.

¶ 13 In February 2009, Oro Valley notified Sanford that it would put the project on hold because "The Keg" still needed a grading permit and to have its civil construction plans approved. The City explained that "[w]hile your building plans have been approved and you've been issued a building permit; you still did not have approved site civil construction documents nor an issued grading permit." The City further explained that the civil construction plans, which "modify the already approved generic site civil plans for this pad to match the current building plans," still had some outstanding issues and therefore could not be approved. In April 2009, "The Keg" still did not have a grading permit.

¶ 14 Keg U.S. thereafter amended the Development Agreement again for TOVK and its affiliate, OVM Keg Land, LLC, to purchase the property, instead of renting the property. The amendment was written on Keg Limited letterhead and signed by Henderson as Keg U.S.'s Executive VP–Business Development and MacLean as Keg Limited's Secretary. OVM subsequently defaulted, however, and Keg U.S. and TOVK amended the Development Agreement once again, agreeing to proceed under their previous agreement where the Sublease governed and TOVK would construct and operate the restaurant. The amendment required that TOVK escrow $1.44 million to be used for construction. The amendment was written on Keg Limited letterhead and signed by MacLean as Secretary.

¶ 15 In September 2009, a month before the then-current construction completion deadline, Jones requested an extension. Janzen told him that the deadline could not be extended, however, because Vestar had established the deadline and she did not "want to go back to Vestar until we start construction and show some level of good faith." Jones responded that he was "comfortable proceeding on the good faith of The Keg." TOVK and Keg Franchise thereafter entered into an Escrow Agreement, signed by MacLean, and TOVK escrowed $1.5 million.

¶ 16 After Jones escrowed the money, Janzen emailed him a copy of "the standard agency letter and letter of intent used by franchisees in Canada." She stated that to proceed with the project, "Keg need[ed] to be appointed as [TOVK's] agent, and [Karson Builders] need[ed] a letter of intent" to allow it "to issue [purchase orders] to the subtrades before the construction contract is finalized." TOVK signed and returned the letters, appointing Keg U.S. as its agent for the construction ("2009 Agency Agreement"). Both the Escrow Agreement and 2009 Agen-

cy Agreement authorized payments to Karson. Keg Limited then authorized advance payments to Karson in October 2009, even though "The Keg" still had not received the grading permit.

¶ 17 In November 2009, still without a grading permit, Jones advised Karson of the need for a performance bond to guarantee Oro Valley that Karson would begin construction. After Karson was unable to obtain the bond, Jones did so, even though he was not responsible for acquiring it; that was the duty of Brunson, Keg Limited's project manager. By this point, Keg Limited had extended the completion deadline to August 2010.

¶ 18 Once "The Keg" finally secured the grading permit, Oro Valley certified the pad in December 2009, which should have allowed Karson to begin construction. But construction was again stalled when the City required additional site work, which took place in January 2010. Construction was again delayed the next month, and by March 2010, Karson stopped construction, claiming it had no funds.

¶ 19 Meanwhile, Jones' assistant was actively pursuing capital to fund TOVK's project. His daily duties included locating possible lenders and capital providers, putting together loan submission packages, following up with lenders, providing them with additional information, and clarifying project details. Jones' assistant contacted 85 lenders. In April 2010, Jones' assistant approached Security National Company ("SNC"), and a loan officer told Jones that SNC could lend TOVK money if all the necessary paperwork was completed.

¶ 20 Jones provided the loan officer the necessary documents and paid the required deposit, and the loan officer prepared SNC's documents, toured the property, and began the approval process. The loan officer began communicating with "The Keg" and wanted to know what guarantees Keg could provide if Jones could not obtain long-term financing. Chow proposed that the parties enter into a "tri-party agreement" because Keg Limited had banking covenants that precluded it from offering a guarantee. The tri-party agreement would provide that SNC would bear the risk during the construction phase, and if

TOVK defaulted, "a U.S. Keg entity" would take SNC's place. For SNC to enter the agreement, however, it needed Keg Limited's and the "U.S. Keg entity's" financial statements. Keg Limited provided its financial statements, but despite numerous requests, never provided financial statements for the "U.S. Keg entity."

¶ 21 In April—four months after construction began and while Jones was working with SNC and "The Keg" for funding—Jones received a notice of default of the Sublease on Keg Limited letterhead, but signed by Henderson as Keg Franchise's Vice President of Business Development. Henderson stated that TOVK had defaulted on its obligations to Keg Franchise, Keg U.S., Keg Arizona, and any other affiliates of Keg Limited, which Henderson referred to collectively as "Keg." Even while Keg U.S. continued to function as the agent of TOVK overseeing the construction project, Henderson stated that TOVK had failed, in the course of that construction, (1) to complete the construction and opening of the restaurant within the Sublease and Ground Lease's time limits and (2) to provide Keg with reasonable evidence that it would be able to complete the restaurant's construction and opening by August 15, 2010. Henderson also stated that TOVK failed (3) to provide a letter from a qualified or reputable lender in an amount sufficient to complete the balance of the restaurant's construction and opening and (4) to deposit sufficient funds in the escrow account for payment of all costs to complete the restaurant's construction and opening. Henderson gave TOVK ten days to cure the default by depositing $3,348,196.32 into the escrow account, or Keg would exercise its remedies under the Development Agreement and/or the Sublease.

¶ 22 Although Jones had received the notice of default, he nonetheless attempted to secure funding. He stopped, however, after Aisenstat contacted Jones by phone and yelled at him for his use of the Keg-brand logo in his ad seeking financing. A portion of that phone call included Aisenstat's threat to default TOVK. Because of the threat, Jones froze the escrow account in late April, but Henderson convinced him to unfreeze it a

few days later by promising that "The Keg" would not default TOVK. Once the account was unfrozen, "The Keg" withdrew $800,000, the balance of monies remaining, from the escrow account. Meanwhile, Jones was working with SNC and "The Keg" and informed Janzen in mid-May that TOVK was preparing for the final approval process. Jones told Janzen that SNC would provide funding on May 17, but it had some questions for "The Keg." Jones asked Janzen for MacLean's availability to speak with SNC.

¶ 23 Two weeks later on June 2, Vestar and Keg Limited modified the Ground Lease, changing the opening date to October 2010, and six days later on June 8, Henderson sent TOVK a letter on Keg Limited letterhead terminating their agreements. Henderson stated that Keg Franchise, Keg U.S., Keg Arizona, and other affiliates of Keg Limited, which Henderson collectively referred to as "Keg," were exercising their remedies because of TOVK's defaults and terminating the Development Agreement and Sublease. Henderson stated that Keg would seek to recover all unpaid rent, damages, attorneys' fees, court costs, and other relief as a result of TOVK's default. TOVK, nonetheless, tried to pay the property rent for July. Meanwhile, Keg Limited took over the restaurant's construction. To fund the construction, Keg Arizona received money from Keg Limited, which paid Vestar the final amount due and the remaining balance of the startup costs. "The Keg" opened the restaurant in October 2010.

### 3. Keg's Suit Against TOVK and the Resulting Judgment

¶ 24 Keg subsequently sued TOVK, alleging tort claims and breach of the Development Agreement, Sublease, and Indemnity Agreement, and anticipatory breach of the Development Agreement and Sublease. TOVK counterclaimed, alleging tort claims and breach of the Development Agreement, Sublease, Agency Agreements, and Escrow Agreement, and the implied covenant of good faith and fair dealing. TOVK also alleged that Keg disregarded the corporate formalities between the Keg entities and acted as if the entities were interchangeable and alter-egos of each other.

¶ 25 After much intervening litigation, the trial court dismissed the parties' tort claims on summary judgment and the parties tried their remaining claims to a jury. During trial, Keg objected to the proposed jury instructions for breach of the agency agreements and on contract modifications and moved for JMOL under Arizona Rule of Civil Procedure 50(a) on TOVK's claims. The court overruled Keg's objections and denied the motions. After the close of evidence, the court read the jurors their instructions, which included the instruction that Keg Limited, as the parent corporation, could be liable under the alter-ego theory of liability for the acts of its subsidiaries:

Parent companies are generally not liable for the actions of their subsidiaries. However, a parent corporation is liable for the acts of its subsidiary under an alter-ego theory when the individuality or separateness of the subsidiary corporation has ceased.

To prove alter-ego liability, the Jones Parties must prove that it is more likely than not that:

(1) the parent company exerts substantially total control over the subsidiary companies; and

(2) that [sic] honoring the separateness between the parent company and subsidiary companies would sanction a fraud or promote injustice.

Factors demonstrating substantially total control include, but at not limited to:

- stock ownership of the subsidiary by the parent;
- common officers or directors; financing of subsidiary by the parent;
- failure of subsidiary to maintain formalities of separate corporate existence;
- similarity of logo; and
- a party's lack of knowledge of subsidiary's separate corporate existence.

A fraud is defined as the giving of a promise to perform a future act made with the present intention not to perform. Injustice

is defined as permitting a wrong to be suffered without remedy.

Keg did not object to this instruction.

¶ 26 The jurors rendered multiple verdicts against both parties, finding that Keg Limited (1) breached the Sublease, resulting in $1,440,000 in damages; (2) breached the 2008 Agency Agreement, resulting in $503,317 in damages; (3) breached the 2009 Agency Agreement, resulting in $503,317 in damages; and (4) breached the implied covenant of good faith and fair dealing, resulting in $997,000 in damages. Keg renewed its JMOL motion under Arizona Rule of Civil Procedure 50(b) and alternatively moved for a new trial under Rule 59(a). After briefing, the court denied Keg's motions.

¶ 27 TOVK moved for attorneys' fees pursuant to A.R.S. § 12–341.01 and a fee-shifting provision incorporated into the Sublease from the Ground Lease. TOVK requested $1,905,727.40 in attorneys' fees and $352,704.10 in expert witness fees. Keg opposed the expert witness fees, arguing that the fee-shifting provision applied only to claims between Vestar and Keg Arizona, which were parties to the Ground Lease, and that the fee amount exceeded Vestar and Keg Arizona's reasonable expectations when they negotiated the Ground Lease. After briefing, the trial court granted TOVK's motion, awarding it $2,263,058.10 in fees. After the court entered judgment against Keg Limited in the total amount of $5,913,301.40, Keg unsuccessfully moved for reconsideration. Keg timely appealed.

## DISCUSSION

### 1. Insufficient Evidence Challenges

¶ 28 Keg argues that the trial court erred in denying its motion for JMOL because insufficient evidence supports the jury's breach of contract verdicts. We review de novo the ruling on a JMOL motion. *Warne Invs., Ltd. v. Higgins*, 219 Ariz. 186, 194 ¶ 33, 195 P.3d 645, 653 (App. 2008). We will uphold the ruling unless "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Felder v. Physiotherapy Assocs.*, 215 Ariz. 154, 162 ¶ 36, 158 P.3d 877, 885 (App. 2007). Further, we will affirm a jury verdict unless it is "so manifestly unfair, unreasonable and outrageous as to shock the conscience." *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 55 ¶ 23, 961 P.2d 449, 453 (1998). In determining whether sufficient evidence supports the verdict, "we look to the broad scope of the trial and not for evidence to support a different conclusion or inference than that reached by the jury." *In re Estate of Hanscome*, 227 Ariz. 158, 162 ¶ 12, 254 P.3d 397, 401 (App. 2011). Sufficient evidence supports the jury's verdicts; therefore, the trial court properly denied Keg's motion.

### 1(a). Theory of Liability for the Contract Breaches

¶ 29 Because Keg Limited's liability either directly or under the alter-ego theory of liability affects all the contract claims, we address contract breach first. Keg argues that Keg Limited could not be held liable for contract breaches because insufficient evidence supports a finding that it was either directly liable or liable under an alter-ego theory for the other Keg entities' actions. Here, the jury returned general verdicts in favor of TOVK and against Keg Limited for breach of the Sublease, the 2008 and 2009 Agency Agreements, and the implied covenant of good faith and fair dealing. Because substantial evidence supports Keg Limited's liability under the alter-ego theory for each of these breaches, we need not address whether Keg Limited breached the contracts to uphold the jury verdicts. *See Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 341, 666 P.2d 83, 86 (App. 1983) (providing that this Court will uphold a general verdict when several counts, issues, or theories are submitted to the jury and if evidence on one count, issue, or theory is sufficient to sustain the verdict).

¶ 30 The record shows that TOVK offered the proposed alter-ego theory of liability jury instructions, and Keg did not object to them. *See* Ariz. R. Civ. P. 51(a); *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 537–38, 647 P.2d 1127, 1135–36 (1982) (providing that fail-

ure to object to jury instructions results in waiver on appeal with respect to any error in sequence of reading instructions and errors in the instructions given). As explained below, the instructions were consistent with Arizona law, providing that a parent corporation may be held liable for the acts of its subsidiaries when the subsidiary corporation's individuality or separateness has ceased. Consequently, the jury necessarily had to find that TOVK entered into a contract with one or more of the Keg subsidiaries and that one or more of those entities breached the contract to find Keg Limited liable for the acts of its subsidiaries. The record shows that the individuality of the subsidiaries between the Keg entities ceased, with evidence that the entities share common officers and directors, that Keg Limited has previously provided financing to its subsidiaries, and that the entities have failed to maintain separate corporate entities by sharing letterhead, mix-matching signature lines for positions and individuals, and referring to the Keg entities interchangeably during their relationship and during trial. *See infra* at ¶¶33–38. No evidence supports a contrary finding. Finally, the record shows that a Keg subsidiary breached each pertinent contract, which, under the alter-ego theory of liability, allows liability to flow from the subsidiary to Keg Limited, the ultimate parent corporation. *See infra* at ¶¶41–47.

 ¶ 31 A corporation will be treated as a separate entity unless sufficient reason appears to disregard the corporate form. *Loiselle v. Cosas Mgmt. Grp., LLC*, 224 Ariz. 207, 214 ¶ 30, 228 P.3d 943, 950 (App. 2010). But when a subsidiary corporation is merely the parent corporation's alter ego and when observing the corporate form would work an injustice, a court may properly "pierce the corporate veil" and hold the parent corporation liable for the acts of its subsidiary. *Gatecliff v. Great Republic Life Ins. Co.*, 170 Ariz. 34, 37, 821 P.2d 725, 729 (1991). This "alter ego" status exists when such unity of interest and ownership exists that the separate personalities of the corporations cease to exist. *Dietel v. Day*, 16 Ariz.App. 206, 208, 492 P.2d 455, 457 (1972). Thus, to establish that Keg Limited is liable under the alter-ego theory, TOVK must show that unity of

control exists and that observance of the corporate form would sanction a fraud or promote injustice. *See Gatecliff*, 170 Ariz. at 37, 821 P.2d at 728; *Jabczenski v. S. Pac. Mem'l Hosps.*, 119 Ariz. 15, 21, 579 P.2d 53, 59 (App. 1978) (providing that to justify judicial disregard of corporate identities, the party must show that "the dominant corporation ... so control[s] and use[s] the other as a mere tool or instrument in carrying out its own plans and purposes that justice requires it to be held liable for the results").

 ¶ 32 Unity of control exists when the parent corporation exercises "substantially total control over the management and activities of the subsidiary." *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285, 297 ¶ 45, 995 P.2d 721, 733 (App. 1999). To be held responsible for actions of its subsidiary, a parent must actually exercise control such that the subsidiary is "a mere instrumentality." *See Oldenburger v. Del E. Webb Dev. Co.*, 159 Ariz. 129, 134, 765 P.2d 531, 536 (App. 1988). Factors proving "substantially total control" include common officers or directors, the parent's financing of the subsidiary, the parent's payment of the subsidiary's salaries and other expenses, the subsidiary's failure to maintain formalities of separate corporate existence, the similarity of the parent's and the subsidiary's logos, and the opposing parties' lack of knowledge of the subsidiary's separate corporate existence. *Gatecliff*, 170 Ariz. at 37, 821 P.2d at 728.

 ¶ 33 Here, unity of control exists between the four entities such that Keg Limited, the parent corporation, exercised substantially total control over the subsidiaries. The record demonstrates that Keg Limited is the parent corporation of Keg U.S., which in turn is the parent corporation of Keg Franchise and Keg Arizona, and that all four entities are sublicensed and sub-sublicensed to use the same trademarks, trade names, and proprietary rights in connection with the Keg restaurant system. The record also shows that Keg Limited had previously financially assisted Keg U.S., Keg Franchise, and Keg Arizona. For example, when Keg U.S.'s ability to build restaurants was

"[q]uite low" and "[v]irtually impossible" as a result of financial conditions in the United States, Keg Limited provided Keg Arizona financial assistance to develop restaurants. Even though Keg Limited had banking covenants that prohibited it from providing Keg U.S. cross-border funding, Keg Limited requested that its bank move money from Canada to the United States twice in "extreme situations" to "look after the ... entire family."

¶ 34 The record also reveals no notable distinction between any of the Keg entities in dealing with TOVK. In their documents and communications with TOVK, all of the Keg entities provided the same business address in British Columbia. Most importantly, all the documents in this case—with all their mismatched signature lines and headings—demonstrate that the entities did not maintain formalities between the separate corporate entities. Keg Arizona entered into the Ground Lease with Vestar; Keg U.S. guaranteed the lease, but Keg Limited guaranteed the construction. Keg Arizona entered the Sublease with TOVK, but Keg Limited signed the Sublease, which referenced the Development Agreement, to which Keg Arizona was not a party. The Indemnity Agreement provided that TOVK would indemnify Keg Limited, although the agreement itself referenced the other Keg entities. Further, the Development Agreement and its amendments referenced Keg Franchise, Keg U.S., and Keg Limited. Finally, the 2008 Agency Agreement appointed Keg Limited and Keg Franchise as TOVK's agents, but the 2009 Agency Agreement, providing the same responsibility for the agent, appointed Keg U.S. as TOVK's agent.

¶ 35 When Keg Limited employees were asked about these discrepancies, they testified that the references to multiple and inconsistent Keg entities were mistakes and typographical errors. But because the jury was presented with inconsistent evidence regarding which Keg entity entered into which agreement with TOVK, which Keg entity was responsible for which interaction with TOVK, and which employee was working for which entity, the jury reasonably could have found that the subsidiaries were mere instrumen-

talities of Keg Limited—the ultimate parent corporation.

¶ 36 The record further shows that the employees involved in meeting with TOVK to discuss the business opportunity and touring potential sites, in communicating with it, the construction manager, and potential lenders, and in sending TOVK the default notice were all employed by Keg Limited, even though they served in other capacities as officers and directors of the subsidiaries or merely did work for the other entities. In fact, none of the individuals involved solely did work for one subsidiary. For example, Aisenstat and MacLean served simultaneously as officers of Keg Limited, Keg U.S., Keg Franchise, and Keg Arizona. Further, MacLean testified that Keg U.S. had three employees, Keg Franchise had no employees, and Keg Arizona had no employees involved in the project before 2010. Moreover, Henderson was Keg Limited's Vice President of Business Development, but (1) testified that he was the Executive Vice President of Business Development for "Keg Restaurants" and (2) signed documents on behalf of Keg U.S. and Keg Franchise and sent the notice of default and termination letter on behalf of those entities.

¶ 37 Finally, during their deposition and trial testimony, all persons who acted on behalf of Keg repeatedly referred to a wrong Keg entity or simply used "the Keg" without specifying the particular entity to which they were referring. For example, Keg's project manager—the individual responsible for insuring the development and construction of the project—testified that he did not know which Keg entity he worked for and assumed that it was Keg Limited because all their documents were on Keg Limited letterhead. Despite well-settled law that a corporation is a separate legal entity, "when one corporation so dominates and controls another as to make that other a simple instrumentality or adjunct to it, the courts will look beyond the legal fiction of distinct existence, as the interests of justice require." *Walker v. Sw. Mines Dev. Co.*, 52 Ariz. 403, 414–15, 81 P.2d 90, 95 (1938). Here, ample evidence is available from which the jury could reasonably con-

clude that unity of control existed among the Keg entities.

¶ 38 Moreover, recognizing the Keg entities as separate and distinct from each other would work a fraud and result in injustice. A fraud or injustice arises if observance of the corporate form would confuse the opposing parties and frustrate their efforts to protect their rights, while allowing the party responsible to evade liability. *See Gatecliff*, 170 Ariz. at 38, 821 P.2d at 729. Particularly, "a fraud may be perpetrated by the giving of a promise to perform a future act made with the present intention not to perform." *Youngren v. Rezzonico*, 25 Ariz.App. 304, 306, 543 P.2d 142, 144 (1975). Here, recognizing the corporate forms would frustrate TOVK's efforts to protect its rights. Different Keg entities entered into different agreements with TOVK, resulting in different responsibilities for each entity. Viewing the development and construction of the restaurant in this piecemeal fashion would result in much work being done, but no entity having entered into any agreement with TOVK to actually build a restaurant. Accordingly, all the individual entities' transactions must be viewed together and in light of each other to create the project.

¶ 39 Consistent with our analysis, Keg counters that because the jury only checked the line on the verdict forms indicating that Keg Limited was liable and did not check any other line indicating that any subsidiaries were liable, Keg Limited cannot be found liable for breach of the contracts because the jury did not find any of Keg Limited's subsidiaries liable. The verdict forms indicated that in rendering a verdict in favor of TOVK and against Keg, the jury had to "check all that apply;" the form then listed the four Keg entities. But the alter-ego theory of liability jury instruction correctly provided that a parent corporation may be liable for the acts of its subsidiaries when the subsidiary corporation's individuality or separateness has ceased. Read in light of the breach of contract instructions, by holding Keg Limited liable for breach of the contracts, the jury necessarily found that TOVK entered into a contract with one or more of the Keg subsidiaries and that one or more of those entities breached the pertinent contract.

¶ 40 Keg has not cited, nor are we aware of, any case requiring the type of jury findings Keg asserts were required. Moreover, accepting Keg's proposition would improperly allow Keg to avoid liability and result in injustice to TOVK. *See Torres v. Goodyear Tire & Rubber Co., Inc.*, 163 Ariz. 88, 94, 786 P.2d 939, 945 (1990) ("The parent company owns the subsidiaries, designates their directors and officers, allocates the capital needed and used by the subsidiaries, and enjoys the profits made by them. Certainly the brain that so competently and thoroughly directs the entire enterprise must be liable for the acts of its appendages."). Viewed in isolation, each entity's act would not have resulted in a project to develop the restaurant. Only after viewing all the transactions together does the relationship between TOVK and the Keg entities form a contractual relationship to build a restaurant. Consequently, because the subsidiaries were "a simple instrumentality" of Keg Limited, the jurors could properly find Keg Limited liable under the alter-ego theory of liability for breach of the contracts to which the subsidiaries were a party.

### 1(b). The Sublease

¶ 41 As to the alleged breaches, Keg argues that insufficient evidence supports the jury's verdict that Keg Limited breached the Sublease's "quiet enjoyment" provision. To prevail on its breach of the Sublease claim against Keg Limited, TOVK had to prove the existence of a contract between it and a Keg entity, breach of that contract, and resulting damages. *See Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170 ¶ 30, 83 P.3d 1103, 1111 (App. 2004). Here, TOVK and Keg Arizona had such a contract. Keg Arizona entered into the Sublease with TOVK, and Keg Limited was listed on the signature block and MacLean signed the contract as Secretary. The Sublease incorporated the Ground Lease between Keg Arizona and Vestar and referenced the Development Agreement between Keg Franchise and TOVK. Further, sufficient evidence supports the jury's finding that Keg Arizona breached the Sublease. The

Sublease provided that "upon payment by the Sub–Tenant of the rents and other monetary payments provided for herein and therein and upon the observance and performance of all obligations contained in this Sublease, the Lease, [and] the Development Agreement ..., the Sub–Tenant shall peaceably and quietly hold and enjoy [the premise]." The record shows that TOVK paid all rent, deposited money as directed into the escrow account, and continued to seek further financing as the Sublease required, but Keg Limited nonetheless terminated the contract. Consequently, sufficient evidence supports the jury's verdict that Keg Arizona breached the Sublease, and liability properly flowed to Keg Limited under the alter-ego theory of liability.

### 1(c). The Agency Agreements

¶ 42 Keg next argues that insufficient evidence supports the jury's verdicts on the agency agreements because TOVK failed to present any evidence that the agreements were enforceable contracts. Keg concedes that a "limited agency relationship" existed between the parties and that relationship gave rise to fiduciary duties imposed by law, but contests that the consideration necessary exists to create a contractual obligation. Agency is both a consensual and a fiduciary relationship. *Maricopa P'ships, Inc. v. Petyak*, 163 Ariz. 624, 626, 790 P.2d 279, 281 (App. 1989). "The inherent nature of the agency relationship imposes a fiduciary duty upon the agent to act according to the terms of the agency agreement." *Id.* In other words, an agent "who makes a contract with another to perform services as an agent for him is subject to a duty to act according to his promise." *Id.*

¶ 43 In Arizona, money is not always required as consideration; instead, adequate consideration need only consist of a benefit to the promisor and a detriment to the promisee. *Carroll v. Lee*, 148 Ariz. 10, 13, 712 P.2d 923, 926 (1986). "A promise exchanged for a promise is sufficient; consideration need not be of like or identical value, and the court will not inquire into the adequacy of consideration." *Nickerson v. Green Valley Recreation, Inc.*, 228 Ariz. 309, 321

¶ 29, 265 P.3d 1108, 1120 (App. 2011). Here, the agency agreements were enforceable contracts because the parties exchanged consideration. Both the 2008 and 2009 Agency Agreements contain the same provision authorizing Keg Limited and Keg Franchise, and Keg U.S., respectively, "with full and absolute power and authority on behalf of [TOVK] to do and execute all such acts, deeds, or matters and things necessary to be done in order to accomplish the stated purposes herein, as fully and effectively, to transact any and all business for the development and construction of the Restaurant." Consequently, the Agency Agreements required TOVK to relinquish all authority regarding the restaurant's construction to Keg Limited, Keg Franchise, and Keg U.S. *to do all things necessary* to construct the restaurant for TOVK's benefit.

¶ 44 Moreover, sufficient evidence supports the jury's verdict finding Keg Limited liable for breach of the 2009 Agency Agreement. The record shows that Keg oversaw the restaurant's construction, from finding the site associated with a developer it had a preexisting relationship with, to hiring a construction company that it also had a preexisting relationship with, and to appointing its own employee as project manager. The jury heard evidence about construction delays attributable to Keg entities, including evidence regarding the project requirements as provided in the Ground Lease and Sublease, the project's timeline, what work and permits were required for construction to begin and continue, how the project proceeded, and why the project ended up being delayed. Consequently, evidence exists from which the jury could reasonably conclude that Keg U.S. breached the 2009 Agency Agreement by not doing what was necessary to develop and construct the restaurant, and liability properly flowed to Keg Limited under the alter-ego theory of liability.

### 1(d). The Covenant of Good Faith and Fair Dealing

¶ 45 Keg next argues that insufficient evidence supports the jury's verdict that Keg Limited breached the implied covenant of good faith and fair dealing. Specifical-

ly, Keg contends that the crux of TOVK's claim was that Keg Limited had an obligation to disclose its financial information or guarantee a loan for TOVK, even though no such obligation appeared in any of the relevant contracts. Arizona law implies a covenant of good faith and fair dealing in every contract. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490 ¶ 59, 38 P.3d 12, 28 (2002). The covenant requires that neither party "act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Beaudry v. Ins. Co. of the West*, 203 Ariz. 86, 91 ¶ 18, 50 P.3d 836, 841 (App. 2002). A party breaches the covenant "by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424 ¶ 14, 46 P.3d 431, 435 (App. 2002). Whether a breach occurred is a question of fact for the jury. *County of La Paz v. Yakima Compost Co., Inc.*, 224 Ariz. 590, 604 ¶ 38, 233 P.3d 1169, 1183 (App. 2010).

¶ 46 Here, sufficient evidence exists from which the jury could reasonably conclude that Keg Limited breached the implied covenant of good faith and fair dealing. The evidence allowed the jury to conclude that Keg Limited exercised express discretion in a way inconsistent with TOVK's reasonable expectations and in ways that, although not expressly excluded in the contracts, nonetheless adversely affected TOVK's reasonably expected benefits. Keg Limited required TOVK to make advance payments to Karson without disclosing that the reason Keg Limited had imposed that requirement was that Keg had delayed paying the contractor on an unrelated project. Further, Keg Limited requested that TOVK deposit more money into the escrow account a month before the completion deadline and incorrectly told TOVK that the completion deadline could not be extended. Moreover, regarding the construction delays, Keg did not diligently pursue obtaining the necessary permits to begin construction, even after Oro Valley notified Keg

that the city needed to put the project on hold because Karson had not completed pre-construction work.

¶ 47 The record further shows that Keg Limited convinced TOVK to unfreeze the escrow account and withdrew $800,000, shortly before sending TOVK a notice of default and a notice that Keg Limited was terminating TOVK's contract based on defaults that had not yet occurred. Moreover, the record demonstrates that Keg Limited induced TOVK to invest over $2 million in developing the restaurant by assuring TOVK in the Sublease and Development Agreement that TOVK would be refunded its investment in the event of a default. Finally, Keg Limited interfered with TOVK's efforts to obtain financing by promising to enter a tri-party agreement with SNC, but then reneging. Consequently, sufficient evidence supports the jury's verdict that Keg Limited breached the implied covenant of good faith and fair dealing.

### 1(e). Damages

¶ 48 Keg also argues that insufficient evidence supports the jury's award of $1.44 million for breach of the Sublease, $1,006,634 for breach of the Agency Agreements, and $997,000 for breach of the implied covenant of good faith and fair dealing. We will not disturb a jury's damage award "unless it is so unreasonable and outrageous as to shock the conscious of this court." *Acuna v. Kroack*, 212 Ariz. 104, 114 ¶ 36, 128 P.3d 221, 231 (App. 2006). Here, the jury's awards of damages were not outrageous. The ten-day trial, with sixteen witnesses and over 200 exhibits, including fifteen depositions stipulated in evidence, provided sufficient evidence to support the jury's damages awards. The record shows that the jury heard testimony about the amount of damages Keg and TOVK suffered as a result of the termination and had the various damage reports available during deliberations. The jury awarded TOVK $1.44 million for Keg Limited's breach of the Sublease—which could correspond to the record's showing that TOVK invested $1.44 million into the project. Further, because the jury had sufficient evidence to find that Keg's delay in managing the restau-

rant's development and construction caused TOVK's default, the jury could have awarded TOVK $1,006,634 for breach of the Agency Agreements as out-of-pocket expenses, lost profit, and prejudgment interest, or a combination thereof. Similarly, the jury's award of $997,000 for breach of the implied covenant of good faith and fair dealing resulted in a total award to TOVK of $3,443,634, which was not outrageous given the large amount of the project. Consequently, because sufficient evidence supports the jury verdicts and awards of damages, the trial court properly denied Keg's JMOL motion.

## 2. The Jury Instructions

¶ 49 Keg argues alternatively that a new trial should be granted because the trial court erroneously instructed the jury. We review a denial of a motion for new trial for an abuse of discretion. *Warne Invs.*, 219 Ariz. at 194 ¶ 33, 195 P.3d at 543. When reviewing the denial of such a motion, we do not weigh the evidence; that is the trial court's function. *Adroit Supply Co. v. Electric Mut. Liab. Ins. Co.*, 112 Ariz. 385, 390–91, 542 P.2d 810, 815–16 (1975). Because the challenged jury instructions did not mislead the jury, the trial court properly denied Keg's motion.

¶ 50 Keg challenges the jury instructions for the agency agreements and contract modification. We review challenged jury instructions to determine whether the trial court gave the jury "the proper rules of law to apply in arriving at its decision." *Durnin v. Karber Air Conditioning Co.*, 161 Ariz. 416, 419, 778 P.2d 1312, 1315 (App. 1989). "A jury instruction need not be a model instruction, as long as it does not mislead the jury when the instructions are read together and in light of each other." *Life Inv'rs Ins. Co. of Am. v. Horizon Res. Bethany, Ltd.*, 182 Ariz. 529, 532, 898 P.2d 478, 481 (App. 1995). "Absent substantial doubt whether the jury was properly guided in its deliberation, we will not overturn a jury verdict because of jury instructions." *Terry v. Gaslight Square Assocs.*, 182 Ariz. 365, 368, 897 P.2d 667, 670 (App. 1994). Here, none of the challenged jury instructions mislead the jury on the applicable law.

¶ 51 For the agency agreements, the trial court instructed the jury that "[w]hen an agency relationship is formed, one person (a 'principal') gives authority, by word or conduct, to another person (an 'agent') to act on their principal's behalf subject to the principal's control. *Agents owe their principals a fiduciary duty. This duty requires an agent to work with reasonable care and skill.*" (Emphasis added.) Keg argues that the instruction was erroneous because it allowed the jury to find liability if any one of the Keg entities either failed (1) to comply with its obligations under the contracts, or (2) to act with reasonable care and skill in carrying out its duties. But the instruction was consistent with Arizona law. *See Maricopa P'ships, Inc. v. Petyak*, 163 Ariz. 624, 790 P.2d 279 (App. 1989) (adopting the Restatement (Second) of Agency, § 40 and holding that an agent would be liable to its principal only if he breached duty to act with reasonable care and skill). The court's instruction provided that the Keg entities had a fiduciary duty to work with reasonable care and skill and that a breach may be predicated on a finding that the Keg entities did not act with reasonable care and skill in carrying out their duties. Moreover, the instructions allowed the jury to find liability only if TOVK proved that (1) TOVK entered into an agency agreement with one or more of the Keg entities, (2) one or more of the entities breached the agreement, and (3) the breach resulted in damages. Consequently, because the instructions did not mislead the jury, the trial court properly instructed the jury.

¶ 52 For contract modification, consistent with the Revised Civil Jury Instructions, the trial court instructed the jury that TOVK "claim[s] the parties changed the terms of the contract. After parties enter into a contract, they may agree to change it. The party claiming there has been a change must prove there was an offer to change the contract, acceptance of that offer, and consideration for the change." Keg argues that the trial court erred because the contracts had provisions limiting the parties' rights to orally modify them and that the instruction should have noted the limitations. But this argument fails because the instruction was consistent with Arizona law on contract modi-

fication. *See Yeazell v. Copins*, 98 Ariz. 109, 115–16, 402 P.2d 541, 545 (1965) (providing that parties may substitute a new contract for the old one by mutual consent); *Ancell v. Union Station Assocs.*, 166 Ariz. 457, 460, 803 P.2d 450, 453 (App. 1990).

¶ 53 Keg also argues that TOVK alleged that "the Keg Parties [orally] agreed to guarantee a construction loan for TOVK and to refund any monies TOVK invested in the project if TOVK defaulted." But Keg misconstrues TOVK's arguments and the documents. First, the Ground Lease specifically provided for a refund to TOVK of all monies expended in the event of a default and that provision was incorporated into the Sublease. Second, TOVK has not associated Keg's "guarantee" with any particular contract; instead, TOVK argues that Keg's "guarantee" was part of its scheme to prevent TOVK from obtaining financing. Consequently, because the instructions did not mislead the jury, Keg's argument regarding the instructions fail.

### 3. The Expert Witness Fees

¶ 54 Keg also argues alternatively that a new trial should be granted because the trial court erroneously awarded TOVK expert witness fees. Keg contends that TOVK is not entitled to such fees because TOVK's pleadings requested only costs and attorneys' fees pursuant to A.R.S. §§ 12–341 and 12–341.01, respectively, and not pursuant to the Sublease, which incorporated the Ground Lease fee-shifting provision. We review the trial court's decision to award expert witness fees under the parties' contract for an abuse of discretion. *See Ahwatukee Custom Estates Mgmt. Ass'n v. Bach*, 193 Ariz. 401, 404 ¶ 14, 973 P.2d 106, 109 (1999). Because recovery of expert witness fees is provided for in the Sublease, the trial court did not err in awarding TOVK the fees.

¶ 55 Expert witness fees are not recoverable under A.R.S. § 12–341, as defined in A.R.S. § 12–332, or A.R.S. § 12–341.01 because such fees are not taxable costs or attorneys' fees, respectively. *See generally Ahwatukee*, 193 Ariz. at 401, 973 P.2d at 106. But because expert fees are nontaxable costs, the trial court has discretion to award such

costs if they are allowed by the parties' contract. *Id.* at 404 ¶¶ 15–17, 973 P.2d at 109; *see also Schritter v. State Farm Mut. Auto Ins. Co.*, 201 Ariz. 391, 392 ¶¶ 7–8, 36 P.3d 739, 740 (2001) (noting that "under section 12–332.A.6, the parties may agree to share [otherwise nontaxable] costs or impose them on the losing party"). Here, nothing in the record indicates that the trial court erred in determining that the Ground Lease permits recovery of nontaxable costs or in awarding such costs under the contract terms. The Ground Lease states that "[i]f Lessor or Lessee files suit against the other which is in any way connected with this Lease, the unsuccessful party shall pay to the prevailing party a reasonable sum for ... costs and disbursements, including the fees, costs and disbursements of consultants [and] professionals." Because the Ground Lease's express language contains a mandatory provision providing for reimbursement of TOVK's costs of consultants, the trial court did not err in awarding TOVK expert witness fees.

¶ 56 Keg counters that TOVK waived its right to seek expert witness fees under the contract because it failed to cite the contract as a basis for recovery in its pleadings. Keg relies on *Berry v. 352 E. Virginia, L.L.C.*, 228 Ariz. 9, 13 ¶ 17, 261 P.3d 784, 788 (App. 2011), and *Robert E. Mann Construction Co. v. Liebert Corp.*, 204 Ariz. 129, 133 ¶ 12, 60 P.3d 708, 712 (App. 2003). But these cases are distinguishable because they addressed the particular situation when attorneys' fees are treated as damages because their recovery is dependent on the contractual provision. *See Mann*, 204 Ariz. at 133 ¶ 12, 60 P.3d at 712 (relying on *Genis v. Krasne*, 47 Cal.2d 241, 302 P.2d 289, 292 (1956) (providing that attorneys' fees recoverable only by virtue of contract are damages that cannot be awarded without pleading and proof that a contract provision exists for them)). *But see City Ctr. Exe. Plaza, LLC v. Jantzen*, 237 Ariz. 37, 41 ¶ 13, 344 P.3d 339, 343 (App. 2015) ("In Arizona, courts generally do not construe 'damages' to include attorneys' fees."). When attorneys' fees are considered damages for purposes of recovery under a contract, like all other damages awards, evidence must be presented to

support such an award. Here, expert witness fees are nontaxable costs and therefore do not fall within the purview of damages for purposes of pleading and proof. *See Jantzen,* 237 Ariz. at 42 ¶ 14, 344 P.3d at 344 (providing that damages "are compensation for actual injury" and actual and compensatory damages are "damages given as an equivalent for the injury done, or damages awarded to a person as compensation, indemnity, or restitution for harms sustained by him"). Therefore, the trial court did not err in awarding TOVK expert witness fees.

#### 4. Attorneys' Fees on Appeal

¶ 57 Keg requests attorneys' fees incurred on appeal pursuant to A.R.S. § 12–341.01 upon compliance with Arizona Rule of Civil Appellate Procedure 21. Because Keg is not the prevailing party, we deny its request. TOVK requests attorneys' fees under the terms of the Sublease and A.R.S. § 12–341.01. Because TOVK is the prevailing party, we grant its request for reasonable fees upon compliance with Rule 21.

### CONCLUSION

¶ 58 For the foregoing reasons, we affirm.